**In re ALL MEDIA PROPERTIES, INC.,
Artlite Broadcasting
Company, Debtors.**

**Bankruptcy Nos. 80–00011–HP,
80–00012–HP.**

United States Bankruptcy Court,
S. D. Texas,
Houston Division.

June 25, 1980.

Alister B. Mahon, Minter & Mahon, Arthur L. Moller, Sheinfeld, Maley & Kay, Houston, Tex., for petitioning creditors.

Stanley B. Binion, Reynolds, Allen & Cook, Houston, Tex., for debtors.

### MEMORANDUM OPINION ON INVOLUNTARY PETITIONS

EDWARD H. PATTON, Jr., Bankruptcy Judge.

This opinion deals with two involuntary Chapter 11 petitions brought under the

Bankruptcy Reform Act of 1978 which became effective October 1, 1979. In this opinion that legislation will be referred to as the Code and the Bankruptcy Act of 1898 which was replaced by that legislation will be referred to as the Act. This distinguishing designation is one that is now universally recognized in the field of insolvency.

One of the alleged debtors is All Media Properties, Inc. (hereinafter referred to as All Media) and the other is Artlite Broadcasting Company (hereinafter referred to as Artlite), a wholly owned subsidiary of All Media. Artlite operates a radio station in Houston, Texas. The two involuntary petitions were consolidated for trial by agreement. The evidence was lengthy, the trial consumed some nine and a half days of testimony followed by briefs and oral argument. At the outset of the trial it was agreed that the court would also hear evidence on the applications by the petitioning creditors for the appointment of interim trustees. In midstream the parties and the court agreed that everyone's interest would be better served if any further testimony on the appointment of interim trustees was postponed until after a judgment on the involuntary petitions, but that evidence already presented on that issue could be later considered by the court without being reoffered.

These cases present issues arising under the Code which have not been dealt with in any reported opinions. The issues to be determined include whether each of the petitioning creditors meets the Code requirements for a creditor entitled to bring an involuntary petition, whether the requisite jurisdictional grounds exist and whether each of the alleged debtors is generally not paying its debts as such debts become due. Because of the fact that the questions presented are apparently ones of first impression under the Code, the court will first make an analysis of the requirements of an involuntary petition under the Code and will then make its legal and factual findings applicable to the particular fact situation here presented.

## ANALYSIS OF INVOLUNTARY PROCEEDINGS UNDER THE BANKRUPTCY CODE

As set forth in 11 U.S.C. § 303 and as is relevant to the cases now before the court, an involuntary case may be commenced under Chapter 7 or Chapter 11 of the Code against any person that may be a debtor under those chapters. In cases such as these where each debtor has more than twelve creditors, § 303(b)(1) provides that a petition may be brought by three or more entities, each of which is a holder of a claim against the alleged debtor that is not contingent as to liability, if such claims aggregate at least $5,000 or more than the value of any lien or property of the debtor securing such claim held by the holders of such claims. Subdivision (c) of § 303 provides that after a petition is brought but before an order for relief is entered or the case dismissed, other qualified creditors may join in the petition with the same effect as if he were an original petitioning creditor. It is provided in § 303(h)(1) that an order for relief shall be entered if the debtor is generally not paying his debts as they become due, that being the allegation here made against both of the debtors.

In determining whether a petitioning creditor is qualified it is necessary first to see if he is, as required by § 303(b), the holder of a claim against the debtor which is not contingent as to liability. Section 101(4)(A) of the Code defines a claim to mean "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; . . ." Under § 303(b)(1) if an entity is the holder of such a right to payment he may join as a petitioning creditor unless his claim is contingent as to liability. It would thus appear that the intent of the Code is to allow the holders of any of the types of claims enumerated in § 101(4)(A) to qualify as a creditor unless his claim is contingent as to liability.

The debtors here contend that the holder of a claim which is unmatured or disputed

cannot be a qualified creditor as that establishes that such claims are contingent in the sense that they are not, at the time of the filing of the petition, fixed or liquidated or now owing but rather that such claims require further proceedings or the passage of time. The debtors' contention is summed up by the following statement in their brief: "if the claim asserted by the petitioners would require proof in order to establish the merits of the claim as to the debtor's liability or the amount of this claim, then such a claim could not be considered to be not contingent as to liability."

Involuntary petitions could be brought under § 59b of the Act which provided that

[t]hree or more creditors who have provable claims *not contingent as to liability* against a person, amounting in the aggregate to $500 in excess of the value of any securities held by them, . . . may file a petition to have him adjudged a bankrupt; . . . (emphasis added)

The decisions under the Act give some guidance of what is meant by "not contingent as to liability", although they may not be controlling.

Under § 59b of the Act, a claim was not necessarily rendered contingent as to liability merely because it was unmatured. For example, in *Matter of Myers*, 31 F.Supp. 636 (E.D.N.Y.1940) the court held that a holder of notes could properly be a petitioning creditor even though some of the notes were not due until after the involuntary petition was filed, because the obligation was "absolutely owing" at the time of the filing. Similarly, in *Kay v. Federal Rubber Co.*, 46 F.2d 64 (3rd Cir. 1930) a holder of trade acceptances which were not payable until after the involuntary petition was filed was considered to be a qualified creditor. Instead, a contingent claim was defined to be "one as to which it remains uncertain, at the time of the filing of the

petition in bankruptcy, whether or not the bankrupt will ever become liable to pay it." *In re Mullings Clothing Co.*, 238 F. 58, 67 (2nd Cir. 1916).[1] It was not necessary that a claim be reduced to judgment before it was not contingent as to liability. Rather, the petitioning creditors who were disqualified were those where claims were "open" and "unliquidated" in that they were tort-type claims or quantum meruit claims which required proof as to liability, reasonable value, or damages. *Denham v. Shellman Grain Elevator, Inc.*, 444 F.2d 1376, 1380 (5th Cir. 1971), *In re Walton Plywood*, 227 F.Supp. 319, 324 (W.D.Wash.1964). Where no additional act or event need have occurred before liability attached, then liability was considered to be non-contingent. *In re Trimble Company*, 339 F.2d 838, 844 (3rd Cir. 1964).

The Code has gone much further in allowing holders of claims to bring an involuntary petition. Under § 101(4)(A) of the Code a claim means a right to payment whether or not reduced to judgment, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed. Section 303(b)(1) gives the right to any holder of a claim except those that are contingent as to liability to be a petitioning creditor.

Thus, Congress has stated that creditors holding, for example, contingent, unliquidated, unmatured, or disputed claims have a right to participate in the bankruptcy process as creditors. Also, there is no longer any requirement that the claims be provable in order for an involuntary petition to be brought. Only holders of claims that are contingent as to liability are denied the right to be petitioning creditors. It is significant that holders of unmatured, disputed and unliquidated claims are not specifically barred from being petitioning creditors.

---

1. It is true that in *Crateo, Inc. v. Intermark, Inc.*, 536 F.2d 862 (9th Cir. 1976) the court indicated that one reason why a petitioning creditor's claim was not contingent as to liability was that a promissory note held by one of the creditors was due at the time the involuntary petition was filed. However, it is clear that the court's statement was dicta and was not supported by any authorities; this court believes that the better view is represented by *Myers* and *Kay*, especially in light of § 101(4)(A), which states that claim includes an unmatured right to payment.

Furthermore, § 303 indicates that there is a difference between a disputed claim, an unmatured claim, an unliquidated claim and a contingent claim. Otherwise, there would be no necessity to include the word contingent. Stated another way, just because a claim is unliquidated, disputed or unmatured apparently does not mean it is contingent.

■ The court concludes that claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.

■ Thus, in the case of the classic contingent liability of a guarantor of a promissory note executed by a third party, both the creditor and guarantor knew there would be liability only if the principal maker defaulted. No obligation arises until such default. In the case of a tort claim for negligence, the parties at the time of the alleged negligent act would be presumed to have contemplated that the alleged tort feasor would be liable only if it were so established by a competent tribunal. Such a tort claim is contingent as to liability until a final judgment is entered fixing the rights of the parties. On the other hand, in the ordinary debt arising from, for example, a sale of merchandise, the parties to the transaction would not at that time view the obligation as contingent. Subsequent events might lead to a dispute as to liability because of, for example, defective merchandise, but that would merely serve to render the debt a disputed one but would not make it a contingent one. A legal obligation arose at the time of the sale, although the obligation can possibly be avoided. Such a claim is disputed, but it is not contingent.

A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created. On the other hand, if a legal obligation to pay arose at the time of the original relationship, but that obligation is subject to being avoided by some future event or occurrence, the claim is not contingent as to liability, although it may be disputed as to liability for various reasons. Likewise, an unmatured obligation is not contingent as to liability. The obligation to pay existed from the outset; no outside event is necessary to bring the obligation into existence, but rather the obligation may be extinguished by payment. This does not render such a debt "contingent as to liability", but renders it only "unmatured".

■ This is not to say that the requirement that the petitioning creditors be holders of claims that are not contingent as to liability is not jurisdictional. It is only to say that this requirement does not mean that all claims must necessarily be liquidated, undisputed, matured, or reduced to judgment for the court to have jurisdiction.

## DEFENSES TO A CLAIM OF A PETITIONING CREDITOR

Under the Act an alleged debtor could defend against an involuntary petition by setting up any defense that would have been available in a civil suit upon the claim. 3 *Collier on Bankruptcy*, ¶ 59.14[5] at 602–03 (14th ed. 1977).[2] This was so even though the claim was non-contingent as to liability. Thus, if an alleged debtor could show that a creditor's claim was barred by limitations, then the involuntary petition could be defeated. Since All Media and

---

**2.** This is not exactly true. Consider, for example, the following hypothetical. Suppose that one of the petitioning creditors was the holder of a promissory note which was not due when the petition was filed. Under the Act his claim would not be contingent as to liability but the alleged debtor would have a valid defense to a suit brought to collect on the note, namely that the note was not due and owing. Still, the creditor would be allowed to bring an involuntary petition under the Act. *In re Myers, supra*; *Kay v. Federal Rubber Co., supra.*

Artlite have asserted defenses to the claims of some of the creditors it must be determined to what extent defenses can be asserted to defeat an involuntary petition under the Code.

■ The Court has decided that where the issues concerning defenses to a claim of a petitioning creditor are not clear and require adjudication of either substantial factual or legal questions, the creditor should be recognized as qualified to join in the bringing of an involuntary bankruptcy petition. On the other hand, if it is clear that the claim is barred and the alleged debtor raises that defense, then that creditor should not be allowed to participate in the involuntary petition. The court believes that this is the correct interpretation for the allowing reasons.

First, the definition of the term "claim" is far reaching and clearly indicates that Congress intended that even holders of disputed claims should be able to seek a determination of whether a debtor is generally not paying its debts as they become due. It seems implicit from both the definition of the term "claim" and the language of § 303(b)(1) that Congress intended that the holders of any type of claim (except those which are contingent as to liability) would be qualified to bring an involuntary petition first, and have the validity of their claims determined at some later proceeding. With less stringent requirements for creditors to qualify to bring an involuntary petition, it is easier for the bankruptcy court to exercise jurisdiction over such proceedings since it is now simpler for a holder of a claim to meet the jurisdictional requirements. The notion of less restrictive jurisdictional requirements for bringing an involuntary petition is consistent with the other broad grants of jurisdiction given to the bankruptcy courts under the Bankruptcy Reform Act of 1978. *See* 28 U.S.C. § 1471.

■ Second, it is important that involuntary petitions be tried and resolved promptly because if the debtor is not pay-

ing its debts as they become due, then its creditors are entitled to the protection of their rights afforded by the Code and to prevent the debtor from wasting its assets.[3] Report of the Commission on the Bankruptcy Laws of the United States, 1973, Part I at 186 (hereinafter referred to as Report). On the other hand, if the alleged debtor is generally paying its debts as they become due, then it is to the debtor's advantage to have a speedy resolution so that it can go about its business unhampered by further proceedings. Thus, issues involving defenses to disputed claims are collateral to the main issue of whether the debtor is generally paying its debts as they become due. Instead, it would be more expeditious for the issues concerning defenses to the claims of petitioning creditors to be determined in a proceeding where that is the primary issue and not a subsidiary one. For a similar approach, see *W. A. Gage & Co. v. Bell*, 124 F. 371, 375–76 (W.D.Tenn.1903).

Third, under the Act some defenses to the claims of petitioning creditors, if proved, rendered the claims not provable. *E. g. In re Wyoming Valley Co-Operative Ass'n.*, 198 F. 436, 440 (M.D.Pa.1912); *In re Putnam*, 193 F. 464, 467 (N.D.Cal.1911), *aff'd*, 194 F. 793 (9th Cir. 1912) *app. dism'd* 235 U.S. 712, 35 S.Ct. 202, 59 L.Ed. 436 (1914). As previously noted, a claim need not be provable for the holder to bring an involuntary petition under the Code. Therefore defenses to claims, even if established, would merely render the claim not provable. Since a holder of a claim which is not provable (because it might be subject to defenses) may now bring an involuntary petition, it is not necessary for the court to rule on defenses to claims at this stage of the proceedings.

■ Finally if the bankruptcy court rules on the issues concerning defenses to the petitioning creditors' claims as part of the involuntary proceeding, the decision on those issues could possibly be res judicata in

---

**3.** Under § 303(f) after an involuntary petition has been filed a debtor may continue to operate its business and acquire or dispose of property as though the petition had not been filed until an order for relief has been entered or until the court orders.

another forum if there is no order for relief entered and the creditor then chose to sue on the debt. *Myers v. International Trust Co.*, 263 U.S. 64, 44 S.Ct. 86, 68 L.Ed. 165 (1923); 2 *Collier on Bankruptcy*, ¶ 18.43[2] at 177 (14th ed. 1976).

As noted, this is a case of first impression. The court has located no reported opinions interpreting involuntary petitions and the issues presented here under the new Code. The conclusions of the court as to the manner in which the defenses to claims should be viewed under the Code is at some variance with pre-Code authorities. It would appear however, that the conclusions are dictated by an analysis of § 303 and the legislative history.

Under § 59b of the Act, petitioning creditors had to have provable claims. There was no implication in the Act as there is in the Code that holders of disputed claims were qualified to initiate an involuntary proceeding. Hence, as part of their proof creditors under the Act were required to establish that their claims were provable—i. e. that they had claims which could be proved in any subsequent bankruptcy proceeding. This is in contrast to the Code which rather clearly entitles the holders of disputed claims to initiate involuntary proceedings as long as the claim is not contingent.

The thrust of the Code is to simplify the issues to be determined under an involuntary petition. The specific acts of bankruptcy have been eliminated and substituted therefor is the broad requirement that the debtor generally is not paying his debts as they become due. Likewise, Congress has expanded the definition of a claim, eliminated the requirement of provability and has opened the door for creditors who hold disputed, unliquidated, unmatured claims to seek involuntary relief, subject only to the limitation that the claim is not contingent as to liability. The Congressional intent is rather clearly to qualify as a petitioning creditor any party holding a non-contingent claim, leaving to later or other proceedings the issue of substantial disputes as to liability. Congress

has indicated that the primary issue in an involuntary proceeding is and should be whether the debtor is generally not paying his debts as they become due and that this issue may properly be placed before the court even though the creditor seeking the relief is the holder of a disputed claim. It therefore must follow that the trial of an involuntary petition is not the place to resolve complex disputes as to the validity of the claim. Accordingly, defenses running to the merits of the claim are not germane to the issue to be determined so long as it appears that the creditor holds a non-contingent claim which is not clearly invalid.

While the views taken by this court concerning the Code represent a major departure from the way that involuntary petitions were handled under the Act, the court believes that the recent changes in bankruptcy law justify this greatly different approach.

The court believes that this approach will not encourage holders of highly questionable or doubtful claims to bring involuntary petitions because § 303(i) provides that if an involuntary petition is dismissed then the court may award costs and attorney's fees, and if the petition is brought in bad faith the court may additionally award damages proximately caused by the filing and putative damages. These provisions of § 303(i) are new, did not appear in the Bankruptcy Act, and should be sufficient to deter those who would bring frivolous petitions against the debtors. Report, Part I at 190.

For these reasons the court believes that it is better to determine whether the holder of the claim has shown that liability on the debt existed, and if so, then whether there is a bona fide dispute as to whether the debt is barred. If there is a bona fide dispute of either fact or law then the holder would not be disqualified from being a petitioning creditor since he would be the holder of a disputed claim, but not one that is contingent as to liability within the definition fashioned above. On the other hand, if the debtor can establish to a certainty that the debt is barred or that the amount is other than alleged without substantial fac-

tual or legal questions, then the alleged debt should not be considered and the holder would not be qualified to be a petitioning creditor in the amount claimed.

Having determined the guidelines established by the Code for the qualifications of petitioning creditors, it is necessary to look at each of the petitioning creditors here involved to determine if they are proper petitioning creditors. The debtors have attacked the standing of most of the petitioning creditors on several grounds including contingency as to liability, limitations, and whether the named creditor is actually the holder of the claim. It is therefore necessary to analyze the status of each petitioning creditor to determine whether he is qualified and if the amounts of the claims held by the creditors satisfy the $5,000 requirement of § 303(b)(1).

It should be noted that the alleged debtors do not deny that they owed some obligation to each of their petitioning creditors (with the exception of David Best) at one time. It is the alleged debtors' contention that each of the petitioning creditors holds a claim which is, for one reason or another, contingent as to liability and that when the amounts of those claims which are not contingent as to liability are added up, they do not meet the $5000 requirement of § 303(b)(1).

## PETITIONING CREDITORS OF ARTLITE

First Marketing Group, Inc. (hereinafter referred to as First Marketing) asserts a claim for $8,000 for services to Artlite for which Artlite has not paid. The evidence showed that First Marketing rendered advertising services to Artlite, a radio broadcasting company, in early 1976 and first billed Artlite in April of 1976. In August of 1976 Artlite fell behind in its payments to First Marketing and by November of 1977 Artlite discontinued making payments to First Marketing. The amount past due is now $8,000. There was some evidence presented by Artlite that Artlite and First Media contemplated that part of the payment for First Marketing's services was to be in the form of a "trade", i. e. Artlite would provide advertising air time on its radio station to First Marketing in exchange for its services to Artlite. First Marketing insisted that the bargain was to be strictly a cash for services deal. After unsuccessful negotiations with Artlite, First Marketing filed suit in state court on January 17, 1979 to collect on the account.

In its amended answer to the involuntary petition, Artlite does not deny that it ever owed First Marketing an obligation, but takes the position that the claim is disputed and is contingent as to liability because the matter was being litigated when the involuntary petition was filed on January 4, 1980. Artlite also contends that most of the obligation owed by Artlite is barred by the applicable statute of limitations. The petitioning creditors' position is that the debt is not barred by limitations, and that even if it was, the limitations defense is no longer valid because Artlite acknowledged the justness of the debt, thereby removing the statute of limitations as a bar to the claim.

Applying the test set forth above, the court concludes that First Marketing is a holder of a claim not contingent as to liability for the amount set forth in the involuntary petition. Artlite has never denied that it owed First Marketing some obligation. The defenses raised by Artlite to First Marketing's claim involve at least two significant questions of law. The first is whether the applicable statute of limitations would bar the debt. Under the facts presented, it does not seem that the debt is barred by limitations, Tex.Rev.Civ.Stat. art. 5527 (Supp.1980), but that issue is better left for a proceeding where it is not a collateral question. The second issue is whether the so called acknowledgement sent by Artlite to First Marketing would remove a limitations defense in a suit to collect on the debt. These questions may make the obligation disputed, but not contingent as to liability. There is a factual dispute as to whether payment was to be in cash or by a trade of air time, but there is no dispute that Artlite was indebted to First Marketing.

Also, the court does not believe that it is significant that the transactions between First Marketing and Artlite may have been a trade of radio air time for services rather than a cash for services bargain. Artlite has not cited the court to any authority which suggests that the claim must be a cash debt. The intent of § 303(b) is that those who are not meeting their obligations can be forced to submit to the jurisdiction of the bankruptcy court. It would be a strange result if a debtor who owed his creditors cash and who was not paying them could be forced into bankruptcy while a debtor who owed his creditors some performance other than cash payment and who also did not tender performance could not be forced into bankruptcy. In either instance the result is the same, because the creditors are not receiving the benefits of their bargains. The purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts. It would be inconsistent with the protective function of bankruptcy to disqualify those creditors who were owed something other than money but were not receiving the obligations that were owed to them, from bringing an involuntary petition. The Code allows a holder of a claim to bring an involuntary petition and a claim is defined under § 101(4)(A) as "a right to payment". Although the Code does not define the term "payment" the word has meant more than just the tender of money for a debt, and has generally included the delivery of other value to a creditor as well. *Smith v. Mills*, 112 Or. 496, 230 P. 350, 358 (1924); *T. F. Morgan Paving Co. v. Carroll*, 211 Ala. 121, 99 So. 640, 641 (1924); *Borland v. Nevada Bank of San Francisco*, 99 Cal. 89, 33 P. 737 (1893).

Even if a creditor is entitled to some remedy other than a money judgment, e. g. specific performance, § 101(4)(B) further defines the term "claim" as including a right to an equitable remedy for breach of performance if the breach gives rise to a right to payment, whether or not such right is reduced to judgment. In Texas, specific performance is an equitable remedy, *Pax-ton v. Spencer*, 503 S.W.2d 637, 642 (Tex. Civ.App.—Corpus Christi, 1973, no writ); *Ferguson v. von Seggern*, 434 S.W.2d 380, 384 (Tex.Civ.App.—Dallas 1968, writ ref'd n. r. e.). However, a party entitled to specific performance may recover money damages in lieu of specific performance. *Kluck v. Leuschner*, 70 S.W.2d 768, 769 (Tex.Civ. App.—Waco 1934, writ ref'd.); *Community of Priests v. Byrne*, 255 S.W. 601, 603 (Tex. Comm'n App.1923). Thus, if Artlite's trade creditors were entitled to specific performance for Artlite's failure to abide by its trade agreements it would mean that those creditors would be entitled to payment since their claims could be reduced to money judgments. For these reasons the court concludes that the fact that a petitioning creditor is owed something other than a cash payment does not disqualify that creditor from acting as a petitioning creditor.

The claim of Atlas Office Supply & Printing Company (hereinafter referred to as Atlas) is in the amount of $439.94 for office supplies sold to Artlite. Artlite's position is that the claim is not a valid noncontingent claim because Artlite paid Atlas its debt after the petition was filed and because the contract between the two parties was a trade of radio station air time for goods. The first assertion, even if true, would not affect Atlas' status as a petitioning creditor. Satisfaction of a claim after the filing of an involuntary petition does not deprive the court of jurisdiction. *Reed v. Thornton*, 43 F.2d 813 (9th Cir. 1930); *In re Gibraltor Amusements, Ltd.*, 187 F.Supp. 931, 937 (E.D.N.Y.1960), *aff'd* 291 F.2d 22 (2nd Cir. 1961), *cert. den.* 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961). The second point has previously been discussed in connection with the claim of First Marketing and need not be considered further. The evidence at trial clearly established that Artlite owed Atlas the amount of its claim when the involuntary petition was filed and it is one which is not contingent as to liability. Therefore Atlas is qualified to bring the involuntary petition.

The claim of Carpet Barn & Tile World (hereinafter referred to as Carpet Barn) is for $3,600 for carpet sold and installed by Carpet Barn at Artlite's radio station. It was shown at trial that the underlying agreement between Artlite and Carpet Barn was a trade of radio advertising time worth $7,200 for carpet, other materials, and labor. Artlite's radio station broadcast about $3,600 worth of Carpet Barn advertisements as agreed, but when the radio station switched from an all news format in English to an all Spanish format, a dispute arose over whether the advertisements were supposed to be in English or whether the advertisements could be broadcast in Spanish. In any event, after the change in format the radio station aired all of Carpet Barn's advertisements in Spanish. On September 19, 1979 Carpet Barn filed suit in state court against Artlite to recover $3,600 on the account. Artlite asserts that its obligation to Carpet Barn is contingent as to liability because of the dispute between Artlite and Carpet Barn that was being litigated when the involuntary petition was filed. Artlite also contends that the claim is less than $3,600 because the original agreement between the two parties contemplated that at least some of the advertisements for Carpet Barn were to be aired in Spanish, so that when Artlite ran Carpet Barn advertisements in Spanish after switching to an all Spanish format, it ·was reducing its debt to Carpet Barn even if it did not eliminate the debt entirely.

There is no question that Artlite owed some obligation to Carpet Barn. However, there are fact questions concerning the terms of the agreement between the two parties. The court would have to determine whether the parties agreed that Artlite was to broadcast some of the Carpet Barn advertisements in Spanish and whether the agreement was modified so that Artlite could broadcast all of the Carpet Barn advertisements in Spanish. There also remains the legal question of whether Artlite has completely discharged its obligation to Carpet Barn. While these may ultimately be proper issues for this or some other court, they are issues which would be better

resolved in a proceeding in which they would not be collateral issues. As with the claim of First Marketing, Carpet Barn's claim is disputed, but it is not contingent as to liability because no further act or event must occur for Artlite's liability to attach.

Even though Carpet Barn's claim may ultimately turn out to be less than $3,600, it would not affect this court's jurisdiction, as the claims of First Marketing and Atlas are over $8,000 and the amount needed is only $5,000. Since all three claims are not contingent as to liability the court concludes that the jurisdictional requirements of § 303(h)(1) have been met and that there is jurisdiction to determine whether Artlite was generally not paying its debts as they became due.

## PETITIONING CREDITORS OF ALL MEDIA

Originally, the three petitioning creditors of All Media were David M. Best, T. Alex Emms, and Dallas Evans. The petitioning creditors have filed an amended motion to amend the involuntary petition against All Media; the court has not yet ruled on this motion. The motion seeks to add D. M. Best Company, Inc. (hereinafter referred to as Best, Inc.) as a petitioning creditor on the grounds that some of the money allegedly owed to Mr. Best individually is actually owed to Best's corporation and therefore the corporation is the holder of a claim against All Media. The motion has been opposed by All Media on the grounds that David M. Best was not a creditor, that therefore the original involuntary petition was filed by only two creditors whose unsecured claims amounted to less than $5,000, and that any attempt to join another creditor would be an attempt to confer jurisdiction upon this court when none existed at the time the petition was filed. Although it is a clever argument, All Media's contention cannot be sustained in light of § 303(c) of the Code, which allows a creditor to join in the petition before the case is dismissed or relief is ordered. Both the House report and the Senate report

indicate that an involuntary petition should not be dismissed for lack of a third creditor if the joining creditor meets the statutory requirements. H.R.Rep.No.95–595, 95th Cong., 1st Sess. (1977) 322, S.Rep.No.95–989, 95th Cong., 2d Sess. (1978) 33, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5819. *See also* Rule 104(e), Rules of Bankruptcy Procedure.

■ All Media would also have the court deny the petitioning creditors' motion to amend their petition because the proposed amendment is not verified or affirmed as required by Rules 11–12 and 109 of the Rules of Bankruptcy Procedure and by 28 U.S.C. § 1746. The answer to this contention is that the verification requirement is not jurisdictional, and can be cured by amendment. *Harris v. Mills Novelty Co.*, 106 F.2d 976, 978 (10th Cir. 1939); *Georgia Jewelers, Inc. v. Bulova Watch Co.*, 302 F.2d 362, 366 (5th Cir. 1962). Also, 28 U.S.C. § 1746 does not impose any verification or affirmation requirement. It only sets out a form which may be used where a verification or affirmation is required. The petitioning creditors will be allowed to amend their involuntary petition to join Best, Inc. subject to a finding by the court that Best, Inc. is a qualified creditor.

The claim of T. Alex Emms is for $215. Mr. Emms lent All Media $1,215 and received a promissory note for the same amount in return. Later, Mr. Emms agreed that the promissory note was to be converted into 400 shares of All Media stock at $2.50 per share and the remaining $215 was to be paid to Mr. Emms in cash. Mr. Emms was not repaid the $215 (although All Media tendered to Mr. Emms a check for $215 after the involuntary petition was filed) and it is this sum which is the basis for Mr. Emms' claim.

In its second amended answer All Media takes the position that the claim of Mr. Emms is extinguished and cancelled by a novation between Mr. Emms and All Media. According to All Media, when a new and inconsistent agreement is substituted for the original debt, the original debt cannot form the basis of an enforceable claim and therefore the claim of Emms cannot be evidenced by the promissory note, as was alleged by Mr. Emms. The reasoning of All Media is that since the parties made a new agreement for repayment of the loan, the promissory note given to Mr. Emms is not evidence of any debt owing to Mr. Emms, so there is no proof of the amount due or the date when the new debt was due. The petitioning creditors contend that the transaction restructuring the debt was an accord and satisfaction because Mr. Emms agreed to accept something other than what he was originally entitled to receive, that the accord was never satisfied because Mr. Emms was never paid the $215, and since the accord was never satisfied, an action on the original debt still survives.

■ Based on the evidence, the court concludes that Mr. Emms is a holder of a claim which is not contingent as to liability. First, the issue of whether the actions taken constitute an accord and satisfaction or a novation involves a substantial legal issue which goes to whether liability might have been extinguished. At best, the issue renders the claim disputed rather than contingent as to liability. Second, All Media admitted in its second amended answer that it tendered $215 to Mr. Emms as payment of his claim after the involuntary petition was filed. In light of such an admission it is hard to see how Mr. Emms could not be said to be a holder of a claim. Third, even if the claim of Emms was not yet due, it does not disqualify him from being a petitioning creditor. 11 U.S.C. § 101(4)(A); *Matter of Myers, supra; Kay v. Federal Rubber Co., supra.* The reason for this is that it is deemed unfair for creditors whose debts are not yet due to be required to stand by and watch the debtor dissipate his assets and not be able to initiate bankruptcy proceedings to protect their interests.

The claim of Dallas Evans is for $858.39. Mr. Evans lent All Media $953.77 by a check dated May 1, 1975 to All Media Properties. Mr. Evans was to receive a promissory note in the amount of $858.39 for the loan, but according to Mr. Evans he never received one, although the testimony showed that

one was apparently mailed to him. A photocopy of the note was introduced into evidence at trial. It is dated May 1, 1975 and calls for quarterly payments to begin on July 1, 1976. Quarterly payments on principal were to start on July 1, 1977 and were to continue until July 1, 1980. On January 28, 1980 after the involuntary petition was filed, All Media sent a letter and a check to Mr. Evans offering payment of the full amount.

■ All Media does not deny the loan was made, but contends that the debt is barred by the statute of limitations. On the face of the note it would seem as though the debt is not barred under the Texas four year statute of limitations, since a cause of action for the first installment would not have accrued until after July 1, 1976 which is less than four years before the involuntary petition was filed. Tex. Rev.Civ.Stat. art. 5527 (Supp.1980).

Even if this is correct, there are several other issues raised by the facts. There is a question of whether it is the petitioning creditors' burden or the alleged debtor's burden to prove that the statute of limitations period has or has not expired. Also, there is a question of whether the time started to run from the date of the check, the date that interest payments first became due, or some other date. Finally, there is a question of whether the debt was taken out of the statute of limitations by All Media's letter and check of January 28, 1980, which according to the petitioning creditors, is an acknowledgment.

On the other hand, it is undisputed that Mr. Evans lent funds to All Media and that he was not repaid before the involuntary petition was filed. His debt may be disputed because of the statute of limitations questions involved but it is not contingent as to liability; All Media's liability was fixed when the corporation agreed to pay back the loan.

The claim of D. M. Best Company, Inc. ("Best, Inc.") is for $17,000 and is based upon three promissory notes given for loans made to All Media by Best, Inc. The amounts of these notes are $6,500, $6,500 and $4,000 and the payee on all three is "David M. Best Company, Inc." All three notes were payable in February of 1980, that is, after the involuntary petition was filed.

The petitioning creditors assert that although the payee named on the notes is David M. Best Company, Inc., the holder of the claim is actually Best, Inc. According to the petitioning creditors, the reason for the discrepancy is that an error was made when the notes were drafted and the payee was intended to be Best, Inc. The evidence showed that there is no such entity as David M. Best Company, Inc., and All Media has not seriously challenged the explanation for the inconsistency. All Media's primary objection to Best, Inc. as a petitioning creditor is that its claim is contingent as to liability because the notes were not due until after the involuntary petition was filed. As previously discussed, the fact that the obligation was not due until after the petition was filed may mean that the debt is unmatured, but it does not mean that it is contingent as to liability. Under the authorities previously cited, the claim of Best, Inc. is not contingent as to liability and it qualifies as a petitioning creditor.

■ In its brief All Media states that Best, Inc. is not entitled to bring an involuntary petition because its claims are fully secured. Although this issue was not raised by the pleadings or at trial, it may go to jurisdiction and it should be considered since a court can take notice and dismiss a claim for lack of jurisdiction on its own motion. *Winters Government Securities Corp. v. NAFI Employees Credit Union*, 449 F.Supp. 239, 242 (S.D.Fla.1978); *McGahey v. Giant Food, Inc.*, 300 F.Supp. 475, 477 (D.Md.1969); *Liguori v. United States*, 246 F.Supp. 530, 533 (E.D.N.Y.1965).

The three promissory notes held by Best, Inc. do provide that they are secured "in accordance with the Jan. 29, 1979 Board Minutes of All Media Properties Board of Directors." The board minutes referred to grants Mr. Best a lien on All Media's property. At trial, the evidence established that

All Media's assets exceeded its liabilities; from this All Media concludes that Best, Inc. holds a claim which is fully secured and contends that there is no indication that Best, Inc. intended to waive its security.

█ Under the Act, a party bringing an involuntary petition could waive its security by failing to mention the security in its petition. *Missco Homestead Ass'n. Inc. v. United States*, 185 F.2d 280, 283 (8th Cir. 1950); *In re Central Illinois Oil & Refining Co.*, 133 F.2d 657, 659 (7th Cir. 1943). There is no apparent reason why this rule should not apply to cases brought under the Code, and the court will apply it in this instance. Here, neither the original involuntary petition nor the amended involuntary petition makes any mention of security held by Best, Inc., and therefore it is presumed that Best, Inc. waived its security. Furthermore, the alleged debtor has not sufficiently established that the debt is fully secured to overcome the apparent choice of Best, Inc. to waive any security and to proceed as an unsecured creditor. Although the evidence was sketchy, there was evidence which showed that there was another lien prior to the lien held by Best, Inc. and that this prior lien was foreclosed by parties other than Best, Inc. This raises the possibility that any security interest held by Best, Inc. was extinguished at the foreclosure sale. Also, the record does not reveal the extent of any other liens that might also encumber All Media's property and which might also be prior to the lien of Best, Inc. Given the evidence, it cannot be said that Best, Inc. did *not* agree to waive its security when it filed the involuntary petition without mentioning its security.

The claim of David M. Best is for $6,500 and is based upon one of four promissory notes given by All Media for moneys lent to it by Mr. Best. The note on which Mr. Best bases his claim was issued in the name of "David M. Best Company, Inc."; it is dated March 27, 1979 and was due March 27, 1980. The notes were not endorsed to Mr. Best, nor was there any evidence of a corporate resolution or other action taken by the cor-

poration to show that the note was assigned or transferred to Mr. Best individually. The petitioning creditors contend that the designation of "David M. Best Company, Inc." as the payee was a mistake and that Mr. Best was in fact the intended payee.

All Media defends against Mr. Best's claim on three grounds. First, All Media alleges that since the note was not payable to Mr. Best and since there was no evidence of endorsement, assignment, or transfer of the note to Mr. Best, the note does not evidence any claim held by Mr. Best. Second, All Media alleges that Mr. Best's claim is contingent as to liability because the debt was not due until after the involuntary petition was filed. Third, All Media alleges that Mr. Best is not a proper party because Mr. Best was the comptroller of All Media when the debts owed to Mr. Evans and Mr. Emms became due, that Mr. Best was responsible for paying those debts but failed to do so, and that the failure of All Media to pay those debts was due to the negligence or malfeasance of Mr. Best while he was the corporate comptroller of All Media.

█ Mr. Best was not the payee nor was the note endorsed to him, therefore there was no presumption that he was the owner of the note. Tex.Bus. & Comm.Code Ann. § 3.201(c) (1968). However, one who is not a payee or endorsee of a note may recover on the note and enforce it in his own name if he can account for his possession and prove his right to the instrument. *Lawson v. Finance America Private Brands, Inc.*, 537 S.W.2d 483, 485 (Tex.Civ.App.—El Paso 1976, no writ). Here, the testimony of Mr. Best and the exhibits offered at trial demonstrate his rightful ownership of the note. Mr. Best testified that "David M. Best Company, Inc." being named as the payee was a mistake and that he, and not the corporation was the intended payee. This explanation is supported by the photocopy of the check used to advance the funds to the corporation, which was drawn on Mr. Best's personal account rather than the cor-

porate account.[4] The court concludes that Mr. Best has established that he is the holder of a claim which is evidenced by the promissory note in question.

■ The answer to All Media's second point is that the notes did not have to be due for the holder to qualify to bring an involuntary petition, since a claim can be unmatured but not contingent. 11 U.S.C. § 101(4)(A); *In re Myers, supra; Kay v. Federal Rubber Co., supra.*

■ The answer to All Media's third assertion is that it does not appear to be relevant under the Code why the alleged debtor does not pay its debts in determining whether a petitioning creditor is a holder of a claim. Even if it were a relevant factor, the evidence does not show that Mr. Best should be disqualified from bringing the petition. Mr. Best was not the only person responsible for the management of All Media and it was the responsibility of others in control of All Media's management as well to see that All Media met its obligations. The evidence demonstrated that Mr. Best became comptroller at a time when the affairs of All Media were not being handled in a prudent manner and that Mr. Best tried to make the best of a difficult situation. The court concludes that Mr. Best's conduct as comptroller of All Media does not disqualify him from bringing the involuntary petition.

4. The checks written to make loans to All Media from Best, Inc. were drawn on a company account and not on Mr. Best's personal account.

5. This is the so called "equity insolvency" test which focuses upon the payment of debts rather than acts of insolvency. To bring an involuntary petition under the Act, petitioning creditors had to prove an act of bankruptcy and "balance sheet insolvency." To determine insolvency under the balance sheet test, the court compared the debtor's assets with his liabilities and if the amount of the liabilities exceeded the amount of the assets then the debtor was considered to be insolvent.

The equity insolvency test was used under some provisions of the Act, *e. g.* §§ 77(a), 84, 130, 323, 423, and 623, but equity insolvency under the Act was the *inability* to pay one's debts as they became due. Thus, cases decided under the equity insolvency test of the Act are

Since Mr. Emms, Mr. Evans, Mr. Best and Best, Inc. are holders of claims not contingent as to liability and together their claims exceed $5,000 this court has jurisdiction to determine whether All Media has been generally paying its debts as they become due.

■ As already mentioned, under § 303(h)(1) of the Code the bankruptcy court shall enter an order for relief against a debtor only where "the debtor is generally not paying such debtor's debts as such debts become due; . . ."[5] This phrase is not defined in the Code and the legislative history is not very helpful, but it seems reasonable to consider both the amount of the debt not being paid and the number of creditors not being paid in determining the answer to the issue.

During oral argument counsel for Artlite and All Media asserted that the term "generally" means usually or a majority of the time, and that the dividing line is one of simple mathematics. According to counsel for the alleged debtors, to be generally not paying his debts a debtor would have to be not paying at least 51% of his debts.

The court rejects this contention. The new test for involuntary petitions was adopted not to restrict and limit the involuntary process but was included to allow more flexibility. The legislative history describes § 303(h)(1) as the "most significant

not very helpful in determining the meaning of "generally not paying such debtor's debts as they become due." *E. g. Tucker v. Rexas American Syndicate,* 170 F.2d 939, 940 (5th Cir. 1948). A debtor might be insolvent under the balance sheet test, but may be paying his debts as they become due. Conversely, a debtor may not be paying his debts as they become due, yet may be solvent in the balance sheet sense of the term because he has the ability to pay his debts. Honsberger, *Failure to Pay One's Debts Generally As They Become Due: The Experience of France and Canada,* 54 Am.Bankr.L.J. 153, 154 (1980). The Senate version of § 303(h)(1) called for an entry of an order for relief when "the debtor is generally unable to pay . . . his debts as such debts become due" but it was not incorporated into the final version of the Code. *See also* Report, Part I at 185.

departure from present law concerning the present grounds for involuntary bankruptcy." H.Rep.No.95–595, 95th Cong. 1st Sess. (1977) 323; S.Rep.No.95–989, 95th Cong.2nd Sess. (1978) 34, U.S.Code Cong. & Admin. News 1978, at 5820. *See* Weintraub and Resnick, *Involuntary Petitions Under the New Bankruptcy Code*, 97 Banking L.J. 292, 293 (1980). Contrary to counsel's assertion at oral argument, this court believes that Congress contemplated that there would be a new and totally different approach to insolvency in involuntary cases when it passed the Code.

A hypothetical serves to illustrate the point. Consider a debtor who has 100 creditors, 15 of which hold 80% of the amount owed by the debtor. These 15 creditors also happen to be the only creditors not being paid by the debtor. Under the test suggested by Artlite and All Media, the fact that only 15 creditors were not being paid would mean that involuntary relief would not be appropriate because a majority of the creditors were being paid. This court does not believe that Congress intended such a result. The term "generally" was not defined in order to avoid the result suggested by the mechanical test put forth by the alleged debtors and to give the bankruptcy courts enough leeway to be able to deal with the variety of situations that will arise.

Instead, the court believes that generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operation. Where the debtor has few creditors the number which will be significant will be fewer than where the debtor has a large number of creditors. Also, the amount of the debts not being paid is important. If the amounts of missed payments are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper. This brings the court to the main issue, whether Artlite and All Media have been paying their debts as they become due.

## ARTLITE

The business records produced at trial to show the state of affairs of both debtors were incomplete at best. The evidence chiefly relied upon by the petitioning creditors to prove Artlite's failure to pay its debts consisted of "spread sheets" and computer printouts. The spread sheets listed the accounts payable of Artlite, along with information about the status of those accounts. The computer printouts also have financial information concerning Artlite. Much of the information originally put into the computer came from the spread sheets. However, testimony developed at trial revealed that there were problems with the computer service and therefore the printouts were not always entirely accurate. Furthermore, there was testimony that not all the relevant data was turned over to the computer service. This too causes the court to have serious reservations about the total accuracy of the printouts.

Also, the petitioning creditors relied upon the testimony of David Armstrong, comptroller for Artlite from January, 1979 to January 1980, to establish the existence of some debts which were not listed on the books and records of Artlite. To refute the petitioning creditors' evidence, Artlite relied mostly on the testimony of Mr. Wigginton, the president of Artlite and All Media, and also a register of checks written to pay bills.

Under Artlite's system of accounting, an account payable was created when a debt remained unpaid for more than 30 days after it was matured. Plaintiff's exhibit 71 is a spread sheet of 50 "new" accounts payable owed by Artlite and the amounts owed. The exhibit shows that of the 50 "new" accounts, Artlite owed payment on 47 of these accounts and had credits on the other three accounts as of December 31, 1979. Since September 30, 1977 Artlite has owed a total of $75,729.49 on the 47 accounts. Of the 47 accounts, eight were over 60 days old as of September 30, 1977; the amount owed on these eight accounts was $13,589.39. Twenty-nine accounts in

the amount of $37,291.70 were over 90 days old as of September 30, 1977.

Through the use of another spread sheet (plaintiff's exhibit 72) the petitioning creditors put on evidence of what were called "old" accounts payable that were due before September 30, 1977 and which remained unpaid at the time the involuntary petition was filed. As of December 31, 1979 there were nine "old" accounts payable totalling $18,267.07.

Additionally, through the testimony of Mr. Armstrong the petitioning creditors established six other debts which did not appear on the books of Artlite but which were past due and unpaid as of December 31, 1979. The amount of one of these accounts was not established by the evidence, but the other five amounted to $9,417.01. Also, the petitioning creditors asserted the existence of a seventh account (Advantage Associates, Inc.) but the evidence failed to substantiate this debt.

To sum up, as of December 31, 1979, four days before the involuntary petition was filed, Artlite owed $75,729.48 in "new" accounts payable to 47 creditors, $18,267.07 in "old" accounts payable to nine creditors, and at least $9,417.01 in debts not carried on the books and records owed to six creditors.

Testifying on behalf of Artlite, Mr. Wigginton offered these explanations for not making payments: (1) some of the accounts had been paid (in cash or trade) before the petition was filed, (2) some of the accounts were disputed and therefore were not due, (3) some of the accounts were brought current after the petition was filed, (4) arrangements were made with some creditors to extend the payments thus rendering those debts not yet due, and (5) some creditors had not demanded payment from Artlite.

■ Under § 303(h)(1) the payment of due debts prior to the filing of the petition would, of course, be a valid defense to an involuntary petition. Similarly, the court believes that where a debtor fails to pay a debt which is subject to a bona fide dispute that debt should not be considered a debt which has not been paid as it became due. There is no apparent reason why a debtor should have to pay disputed debts to avoid the entry of an order of relief. Mr. Wigginton's unrebutted testimony was that 12 of the 50 "new" accounts payable had either been paid or were in dispute. These 12 accounts amount to $17,942.03. Of the "old" accounts payable there was no evidence that these accounts had been paid; of the six accounts not on the books of Artlite, four were not paid prior to the petition, one was satisfied by a trade agreement that had been executed, and one was disputed. The trade account was for $1,200; the amount of the disputed account cannot be determined with any preciseness since there was no evidence on what the amount of the indebtedness was. This leaves at least $8,217.01 on the six debts not carried on the books which clearly were not paid by the time the involuntary petition was filed.

■ Artlite contends that the court should consider payment of its delinquent accounts payable after the involuntary petition was filed as evidence of payment of its debts as they became due. The Code does not address the issue, but the court believes that consideration of post-petition payments of debts would be erroneous, at least in this instance. First, the language of the statute states that relief is proper where debts are not being paid as they become due. The post-petition payments were not of debts as they came due, but of debts that had been due for some time; the reason for the post petition payments was not because the debts were due but was clearly to avoid the consequences of this proceeding. Second, if it takes the drastic measure of the filing of an involuntary petition to motivate the debtor to pay its debts, relief is appropriate so that a plan can be formulated to insure that the debtor does not fall back into the pattern of not paying matured debts, perhaps precipitating another involuntary petition. Third, to deny relief simply because the debtor brings some of his debts current after the petition is filed would deprive other creditors, who remain unpaid, of the protective provisions afford-

ed creditors under the Code. Under the circumstances presently before this court the evidence relating to post petition payment of debts would seem to have more relevance on the issue of whether a trustee should be appointed or whether the alleged debtor's improved performance in the payment of its debts is sufficient to allow it to remain as a debtor in possession.

This brings the court to Artlite's assertion that its arrangements with its creditors to extend the time for payments renders those debts not due and therefore ought not be considered as debts not paid as they became due. Assuming, without deciding, that Artlite's position is correct, the effect of these arrangements would be minimal in this case. Although Mr. Wigginton testified that there were arrangements with creditors to extend the time for payment, his testimony did not reflect when the arrangements were made. Mr. Armstrong recalled only three specific arrangements made on "old" accounts payable, those being with ASCAP, Associated Press, and Computer Statistics. According to Mr. Armstrong, all three were made in late 1979 and were similar in nature. Artlite was to keep new monthly charges current and also pay back a portion of the past due debt each month until the past due amounts were eliminated. The total amounts represented by these three accounts as of December 31, 1979 was $5,648.81. No other witness could remember when any other arrangements were made, and the court cannot assume that they were made prior to the filing of the involuntary petition. There was no evidence that arrangements had been made on "old" accounts payable or on those debts which were not on Artlite's books. Although in this particular case the court is willing to assume that the arrangements made before the involuntary petition was filed removed those debts from the category of not being paid as they become due, it would actually seem that making arrangements to extend payment is evi-

dence of failure to pay debts as they become due.

■■■■■■ Turning to Artlite's fifth contention, the court is of the opinion that the fact that some of Artlite's creditors did not demand payment does not prove that the debts had not become due. Where there has been a showing that a debt has remained unpaid for more than 30 days after it has been billed it is sufficient to establish that the debt has not been paid as it becomes due. The reason for this is that ordinarily this is the way that business is done. When a creditor sends out a bill, prompt payment is expected, absent an agreement to the contrary.[6] A creditor should not be expected to extend credit to a debtor by having to wait for prolonged periods for payment, unless that was the agreement of the parties. The debtor can always show that under the agreement payment was not due until some later time. Here, there was no compelling evidence that Artlite's debts were due at later dates. The reasonable inference is that Artlite's creditors expected to be paid when they billed Artlite. Therefore, the court will not exclude as debts not yet due those debts for which a demand for payment had not been made at the time the petition was filed.

Artlite also takes the position that the corporation's check and deposit register showed that, on a day to day basis, Artlite was generally paying its debts. The register contains the following information: the date that checks were drawn and deposits made, the names of the payees, the identification numbers of the checks, the amounts of the checks drawn and deposits made, the amount of money that had been drawn from a line of credit extended to Artlite from Braes Bayou National Bank against which the checks were drawn, and the amount remaining on the line of credit. The entries in the register show that in the months preceding the filing of the involuntary petition checks were written mostly to

---

**6.** This seems to be a commercially reasonable approach and not very oppressive to debtors. Under § 2–310(a) of the Uniform Commercial Code, in effect in all but one state, payment is due when the buyer is to receive the goods, unless otherwise agreed. While § 2–310(a) may not be controlling here, it is an insight to expected commercial practice.

pay employees, electricity and telephone bills, automobile and gasoline expenses, IRS payroll taxes, postage, advertising costs, printing costs, two large loans, and a number of individuals whose relationship to Artlite was not identified. The check register also shows that some of the checks written were returned for lack of sufficient funds, because in both November and December of 1979 Artlite was charged for having written bad checks. Furthermore, the register shows that between September and December of 1979 Artlite exceeded its $50,000 line of credit on numerous occasions. Moreover, there is no proof of when the checks were actually sent to the creditors and Mr. Armstrong's testimony concerning procedures for paying creditors is revealing. His testimony showed that when bills came in he would pay those that he could and those that he had no money to pay he would enter as accounts payable. Mr. Armstrong stated that he tried to "filter" the payments to avoid being overdrawn at the bank. It was Mr. Armstrong's practice to write but not mail out checks until the money was available to cover the checks. Under Artlite's procedures, these accounts would show up on the computer printouts as being paid, even though the check had not been mailed to the creditor. The reason for doing this was simply because there was not enough money in the bank to pay the accounts as they became due. Mr. Armstrong would decide which bills were most pressing, such as electricity and telephone, pay them, and postpone paying the others until (if ever) funds became available. Mr. Armstrong's testimony demonstrated that while Artlite was paying enough of its debts to get by on a day to day basis, the company was in a precarious financial situation and explains why Artlite was unable to bring many of its accounts payable current.

Thus, the evidence shows that as of December 31, 1979 there were 35 of 47 "new" accounts payable in the amount of $52,138.64 which were not paid as they became due, 9 "old" accounts payable in the amount of $18,267.07 which were not paid as they became due, and 4 of 6 other debts which were not carried on the books of Artlite in the amount of $8,217.01 which were not paid as they became due. Given the number of creditors and the amounts involved, it cannot be said that either are insubstantial, and the court concludes that Artlite, at the time the petition was filed, was generally not paying its debts as they became due.

## ALL MEDIA

The evidence concerning the affairs of All Media is scant. As with Artlite, there are computer printouts of the business transactions of All Media, but as previously noted in connection with Artlite there were many problems and discrepancies with the computer printouts which severely limit their probative value. However, the other exhibits and testimony offered at trial are helpful.

The creditors of All Media can be divided into two groups. The first group consists of First South Leasing and the law firm of Dickinson & Ewalt. The second group of creditors consist of holders of promissory notes executed on behalf of All Media.

The evidence showed that All Media owed First South Leasing on two accounts. One account was in the amount of $24,920.50 which was incurred before September 30, 1977 and which was unpaid at the time the involuntary petition was filed. The second account was for debts incurred after September 30, 1977 and which accrued monthly at the rate of $6,500. Although All Media previously lagged behind on its payments on this second account (creating a large amount which became past due), at the time the involuntary petition was filed, All Media was making its monthly payments to First South Leasing. The debt to Dickinson & Ewalt was not incurred until December of 1979 and it was not paid at the time the involuntary petition was filed. It was not shown when this debt became due.

The circumstances surrounding the holders of the promissory notes are more complicated. Until April 11, 1979 there were 29 notes for various amounts and due at various times on which All Media was liable for

payment. The total amount of these notes was well over $400,000. Some of the creditors held more than one promissory note; the following is a list of the creditors, the number of notes held by each, and the amount of the notes that each creditor held as of April, 1979:

| American Savings | one note | $110,602.92 |
| South Main Bank | one note | 138,957.75 |
| Donald Wigginton | five notes | 88,440.25 |
| T. Alex Emms | one note | 215.00 |
| Dallas Evans | one note | 858.39 |
| Equitable Exchange | six notes | 49,596.75 |
| Patrick Baum | one note | 399.56 |
| Indiana National Marketing | four notes | 44,949.48 |
| David Best | one note | 6,500.00 |
| D. M. Best, Inc. | three notes | 17,000.00 |
| Dean Becker | one note | 1,100.00 |
| American Managers | four notes | 22,887.50 |

The notes payable to American Savings and South Main Bank had installments due each month and these were regularly paid on time. On April 11, 1979 Don Wigginton replaced some of the notes with four other promissory notes in the amounts of $52,214.09, $67,670.86, $61,041.27 and $7,534.50. The notes which were replaced were held by Mr. Wigginton, Equitable Exchange, Indiana National Marketing (Mr. Wigginton being the president of both Equitable Exchange and Indiana National Marketing), and American Managers, which apparently agreed to the replacement. These replacement notes were secured by a security agreement given by All Media on the equipment, fixtures, furnishings, accounts, broadcasting license and all outstanding stock in Artlite. The notes were further secured by a deed of trust on some land in Fort Bend County. The three largest replacement notes were payable to Mr. Wigginton, the smallest note was payable to American Managers. All four notes were due 90 days from April 11, 1979 but none was paid before the involuntary petition was filed.

Other notes which were not replaced, were not due until after the petition was filed, including the notes payable to Mr. Best and Best, Inc., Mr. Evans, Mr. Emms and Mr. Baum. However, the Evans, Emms and Baum notes call for quarterly interest payments starting in July, 1977, and there was no evidence that these interest payments were ever made.

Mr. Wigginton's explanation for not paying First South Leasing, Inc. was that he personally made two payments on the account and that he worked out an agreement in September of 1979 to pay $2,000 a month when possible to catch up on payments. However, the evidence indicates that since September of 1979, the only payments made to First South Leasing were the regular $6500 payments which were due each month; the arrearage has not been paid. Mr. Wigginton stated that the law firm of Dickinson & Ewalt had not yet asked for payment.

As to the replacement notes, Mr. Wigginton stated that he and American Managers were willing to delay payment until All Media was able to pay the notes. There was no evidence that the other holders of notes on which either principal or interest payments were due were timely paid or agreed to delayed payment.

■ The court concludes that All Media has not generally been paying its debts as they become due. Besides the sizeable amounts owed to First South Leasing, All Media made payments on only two promissory notes on which principal has become due. Even though Mr. Wigginton testified that he and his affiliated companies were willing to postpone payments, the court has a problem in believing that this means that All Media has been paying its debts as they became due. Since Mr. Wigginton is an insider to All Media and his other companies (which are also creditors of All Media), for him to say that he and his affiliates are willing to have payments deferred and that therefore All Media is generally paying its due debt means that the other creditors who have not been paid must bear the additional risk that All Media's position might further deteriorate. The court believes that the other creditors who are not insiders are entitled to the relief provided under the Code. The fact that a debtor is not paying "insiders" who happen to be creditors, and that those "insiders" are not pressing for payment does not negate the fact that the debtor was not paying its

debts as they became due. The purpose of an involuntary Chapter 11 proceeding is to protect all creditors from the loss occasioned by a company failing completely. This purpose cannot be accomplished if a debtor, by arranging to postpone payments to "insider" creditors, is then said to be generally paying his debts as they become due. Even though Mr. Wigginton agreed to postpone payment, All Media did not even pay the interest on the smallest of the notes even though it had been due for over two years in some instances. Although the number of creditors involved is not large, most of those whose debts are due have not been paid as agreed to by All Media. For these reasons an order for relief will be entered against All Media also.

An order conforming with this opinion is being entered this date.