In re JOHNSTON HAWKS, LTD., Debtor.

**Bankruptcy No. 85–00067.**

United States Bankruptcy Court, D. Hawaii.

May 23, 1985.

Michael A. Yoshida, Honolulu, Hawaii, for debtor.

Don J. Gelber, Honolulu, Hawaii, for petitioning creditors.

## MEMORANDUM DECISION AND ORDER

JON J. CHINEN, Bankruptcy Judge.

On February 5, 1985, Chicago Credit Services ("Chicago Credit"), Champion Mortgage Company ("Champion") and MPI Consultants ("MPI") (collectively called "petitioning creditors") filed an Involuntary Petition Under Chapter 7 against Jack J. McGarrity, an individual ("McGarrity"), and Johnston Hawks Limited, a Hawaii corporation ("Johnston Hawks").

On March 12, 1985, McGarrity and Johnston Hawks filed a Motion For An Order Dismissing Proceedings and Assessing Attorneys' Fees and Costs, Damages and Punitive Damages or, in the Alternative, Requiring Petitioning Creditors to File a Bond ("Motion to Dismiss"). At the hearing, Michael A. Yoshida, Esq., represented Jack J. McGarrity and Johnston Hawks, and Robert J. Faris, Esq., and Don Jeffrey Gelber, Esq., represented the petitioning creditors. At the conclusion of the hearing, this Court dismissed McGarrity from these proceedings and further ruled that a subsequent hearing will be scheduled to determine whether attorneys' fees, costs and damages should be assessed against the petitioning creditors with respect to McGarrity. Johnston Hawks is the remaining debtor in the involuntary petition. On May 10, 1985 the Court issued a partial oral ruling on the Motion to Dismiss. This Memorandum Decision further clarifies and modifies the Court's oral ruling and also addresses the remaining issues in this case.

### FACTUAL BACKGROUND

On February 5, 1985, Chicago Credit, Champion Mortgage and MPI filed a joint Involuntary Petition under Chapter 7 against McGarrity and Johnston Hawks. The Involuntary Petition was filed on behalf of the petitioning creditors by Burton R. Berman ("Berman"), an attorney who practices in San Diego, California. Shortly after the involuntary petition was filed, the Court's staff notified Berman that a joint involuntary petition was not proper. Berman then retained the Hawaii law firm of Gelber & Gelber to correct the defects in the petition. On March 8, 1985, an Ex Parte Motion to Strike Debtor Jack J. McGarrity From Involuntary Petition was filed by the law firm of Gelber & Gelber on behalf of the petitioning creditors. The involuntary petition was not served on McGarrity and Johnston Hawks.

On March 12, 1985, McGarrity and Johnston Hawks filed the instant Motion to Dismiss and, on the following day, McGarrity and Johnston Hawks filed a Notice of Hearing on the Motion to Dismiss. This Notice provided that the petitioning creditors had filed an Involuntary Petition against McGarrity and Johnston Hawks and that McGarrity and Johnston Hawks have filed a motion seeking to dismiss the Involuntary Petition. In addition, this Notice provided that any creditor or interested party may file written objections to the dismissal or may appear to contest the dismissal. The Notice also provided that creditors have the opportunity to intervene in the involuntary petition if they believe that this case should not be dismissed. McGarrity and Johnston Hawks sent this notice to 40 creditors on March 12, 1985.

At the hearing on the Motion to Dismiss, the Court dismissed McGarrity from the proceeding. Johnston Hawks (hereinafter referred to as "Debtor") is the remaining debtor in the involuntary petition.

The Debtor is a Hawaii corporation which is wholly owned by McGarrity and his wife. The Debtor's principal business is the development of a time-share resort, known as "Shadow Hawk", located in Welches, Oregon.

The involuntary petition was filed by three creditors of the Debtor who contend that they are holders of claims against the Debtor with respect to the financing of the Shadow Hawk project. Champion asserts that it is a holder of a claim in the amount of $150,000.00 for its services as the bond broker. MPI contends that it is the holder of a claim for its services as the interim loan broker. Chicago credit asserts that it is the holder of a claim in the amount of

$10,000.00 based upon a promissory note which the Debtor had given to Champion in connection with the financing of the project and which was subsequently transferred to Chicago Credit.

On September 6, 1983, the Debtor transmitted to Champion an Application for a Stand-by Loan Commitment in the amount of $6,000,000.00 for a term of two years. The Application provided for a commitment fee in the amount of 5% ($300,000.00) for the first year plus 3% for each additional year the commitment is kept in force. The Application was accompanied by a deposit in the amount of $30,000.00 and provided that, in the event the Debtor elects not to accept the stand-by loan commitment, the deposit shall remain with Champion as full compensation for its efforts in issuing the loan.

Champion asserts that after the Application was sent, the Debtor and Champion agreed that a financial guaranty bond would be issued to secure its obligations under the stand-by loan commitment and that this agreement was confirmed in a letter dated December 1, 1983 from Vincent Coniglio, the President of Champion, to Robert Garner, who acted as the Debtor's agent in connection with the transaction. Champion asserts that the Debtor agreed that the bond premium of 2% would be paid by Champion out of its 5% fee ($300,000.00), leaving a net fee owed to Champion in the amount of $180,000.00. Champion claims that after deducting the $30,000.00 deposit which was paid with the Application, the Debtor owes Champion a balance of $150,000.00.

In a letter dated December 14, 1983, Champion agreed to provide the Debtor with a conventional stand-by loan commitment and financial guarantee bond subject to certain terms and conditions. Champion requested an additional $10,000.00 for the stand-by loan commitment and financial guarantee bond. Champion apparently threatened to withdraw the stand-by commitment and guarantee bond if the Debtor failed to pay the additional $10,000.00. In a letter to Champion, dated March 19, 1984,

McGarrity indicated that the Debtor would have difficulty paying the additional $10,-000.00 and asked Champion not to withdraw the stand-by commitment and guarantee bond.

On February 27, 1984, the Debtor executed a promissory note in favor of Champion in the amount of $10,000.00. The promissory note is subject to the following condition:

This Note is payable upon receipt of an interim loan commitment for Shadow Hawk, and is secured by the stand-by loan commitment from Champion Mortgage, with terms and conditions satisfactory to Johnston Hawks, Ltd. and Jack J. McGarrity.

On November 1, 1984, approximately four months prior to the filing of the involuntary petition, Champion Mortgage claims to have transferred its right, title and interest in the promissory Note to Chicago Credit. Champion claims that this transfer was made in partial satisfaction of a debt owed by Champion to Chicago Credit and that it received a credit of $7,500.00 against its debt to Chicago Credit. Neither Champion nor Chicago Credit has presented any information or evidence with respect to the nature of Champion's debt to Chicago Credit. Moreover, they have not submitted any document evidencing the transfer of the promissory note from Champion to Chicago Credit.

Subsequently, the stand-by loan commitment was not required for the financing of the Debtor's project. Champion contends that although the stand-by loan commitment was not required, the financial guaranty bonds procured by Champion were necessary to obtain the financing which was ultimately secured for the Debtor.

In addition, Champion claims that the Debtor has repeatedly admitted and acknowledged the existence of its obligation to Champion. For example, Champion refers to a letter dated November 8, 1984, in which McGarrity instructed First American Title and Insurance Company of Oregon, the escrow holder, to disburse $150,000.00 to Champion. In this letter, McGarrity

stated that he had revised the escrow disbursement list for the closing. Item 13 of this list provides that $150,000.00 is to be paid to Champion as the Bond Broker. This letter was written approximately four months prior to the filing of the involuntary petition.

Champion also refers to a letter dated December 20, 1984, from McGarrity to Glacier General Assurance Company, in which McGarrity stated that Glacier had in its possession the sum of $150,000.00 payable to Champion for broker's fees. Finally, Champion claims that $150,000.00 was placed in a bank account in the First Interstate Bank labelled "Johnston Hawks, Limited/Broker's Fees" together with funds owed to MPI Consultants.

On the other hand, the Debtor contends that Champion's claim is subject to a bona fide dispute and is contingent. The Debtor asserts that the Application makes no mention whatsoever that Champion was to act as a "bond broker". In addition, the Debtor argues that the financial guarantee bond was a condition imposed by Champion which was not accepted by the Debtor. The Debtor claims that, although Champion issued a stand-by loan commitment on December 14, 1983, the Debtor elected not to accept the stand-by loan commitment. The Debtor asserts that the Application provides that if the Debtor does not elect to accept the stand-by loan commitment offered by Champion, then the $30,000.00 deposit will remain with Champion as full compensation for its efforts in issuing the stand-by loan commitment. The Debtor claims that it made this payment by way of a check from Canadian Imperial Bank of Commerce. Therefore, the Debtor argues that it has satisfied its obligations under the Application.

Furthermore, Debtor claims that, when it acknowledged owing $150,000.00 to Champion in several letters, it mistakenly believed that it was further indebted to Champion under the Application. The Debtor asserts that after consulting with counsel and being apprised of its legal rights, it concluded that no further indebtedness was owed to Champion other than the $30,000.00 deposit which had been paid.

In the involuntary petition, MPI claims to be the holder of a claim against the Debtor in the amount of $120,000.00 for interim loan broker services. MPI claims to have acted as a broker and, together with Champion, to have secured an interim loan for the Debtor to develop the Shadow Hawk project.

MPI contends that the Debtor has repeatedly acknowledged this debt. On November 8, 1984, McGarrity wrote a letter to First American Title and Insurance Company of Oregon, the escrow holder for the loan transaction, which directs the escrow holder to disburse certain funds at closing from the proceeds of the loan. Item 15 of the disbursement list states that $120,000.00 should be disbursed to "MPI Consultants (Interim Loan Broker)." Further, in a letter dated December 20, 1984, from McGarrity to Glacier General Assurance Company, McGarrity stated that Glacier should have in its possession the sum of $120,000.00 which was due to MPI Consultants on account of "broker's fees."

However, on February 14, 1985, MPI agreed to execute a full and complete release of all claims in exchange for $25,000.00. The Debtor paid MPI $25,000.00 and on February 19, 1985, MPI execute a Waiver and Full and Final Release of All Claims ("Waiver") in which it agreed to release the Debtor from all claims connected with any transaction between MPI and the Debtor. The Waiver further provides that any possible claims which MPI may have against the Debtor are limited to fees which may have been earned by MPI with respect to its assistance in obtaining financing for the Shadow Hawk project. In a letter to Champion's president, Vincent Coniglio, dated March 19, 1985, Prugh, the owner of MPI, explained that he accepted the $25,000 as a settlement of MPI's claims and that he executed the Waiver on behalf of MPI only because of his advanced age and bad health.

## CONCLUSIONS OF LAW

### I. *Service of Process*

■ In its Motion to Dismiss, the Debtor claims that it was not served with the involuntary petition. Bankruptcy Rule 1011 provides that defenses and objections to the involuntary petition shall be presented in the manner prescribed by Rule 12 of the Federal Rules of Civil Procedure. Rule 12(b)(5) of the Federal Rules of Civil Procedure provides that a defense of insufficiency of service of process may be made by motion. In addition, Rule 12(b) provides that "[n]o defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion." Fed.R.Civ.P.R. 12. Courts are generally reluctant to dismiss an action based on insufficient service of process since dismissal often involves additional expense and postponement of the adjudication especially in a situation where dismissal may lead to the reinstitution of the suit.

> The reluctance of the courts to dismiss an action when there is a possibility that effective service will be completed is understandable inasmuch as the dismissal would be without prejudice and would lead to the reinstatement of the suit by plaintiff. Thus, dismissal needlessly burdens him with additional expense and delay and postpones adjudication of the controversy's merits.

Wright & Miller, Federal Practice and Procedure: Civil § 1354. In such a situation, courts have quashed the service of process rather than dismissed the action.

In the instant case, the Court notes that there is no certificate of service in the files evidencing service upon the Debtor. Likewise, there is no indication in the records and files in this case whether the petitioning creditors attempted to serve the Debtor. As such, this Court finds that the Debtor was not properly served with the involuntary petition. The Court, however, is reluctant to dismiss the petition based upon insufficient service of process for, as hereinafter more fully discussed, the Court finds that Champion and MPI are proper petitioning creditors and as such may reinstate the petition. In such a situation, the policy reasons articulated above are applicable and dismissal will unduly burden Champion and MPI with additional expense and delay and will merely postpone the adjudication of the controversy. Instead, the Court allows Champion and MPI an additional two weeks from the date of this Memorandum Decision within which to properly serve the Debtor.

### II. *Petitioning Creditors.*

■ Section 303 of the Bankruptcy Code governs the filing of involuntary petitions and provides for several stringent tests which must be satisfied before a debtor may be placed in an involuntary bankruptcy. First, the petitioning creditors must have proper standing. Second, if the Court finds that the petitioning creditors have proper standing, the Court must then determine whether the debtor has generally not been paying its debts as they become due.

This memorandum decision concerns the first test, i.e. the standing of the petitioning creditors. In its Motion to Dismiss, the Debtor attacked the standing of each of the petitioning creditors. In particular, the Debtor asserts that Champion and Chicago Credit do not qualify as petitioning creditors because their claims are contingent and/or subject to bona fide disputes. In addition, the Debtor asserts that MPI has no standing because MPI's claim has been satisfied and because its claim was subject to a bona fide dispute. The following is a discussion of the guidelines set forth by the Bankruptcy Code with respect to the standing of petitioning creditors in an involuntary bankruptcy.

Since this case involves more than twelve creditors at the time the petition was filed, the standards set forth in Section 303(b)(1) of the Bankruptcy Code applies to this case. Section 303(b)(1) provides that an involuntary case against a person is commenced by filing a petition under Chapter 7 or 11

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject on [sic] a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

Under the former and present bankruptcy statutes, creditors holding contingent claims consistently were not permitted to be petitioning creditors. It has been held that "[a] claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (S.D.Tex. 1980).

In contrast, disputed debts have been treated differently under the Bankruptcy Act of 1898, under the Bankruptcy Code of 1978 and under the Bankruptcy Amendments of 1984. Under the Bankruptcy Act of 1898, a creditor in order to qualify as a petitioning creditor must have a provable claim. 11 U.S.C. § 59b. *In re All Media Properties*, 5 B.R. at 135. Section 59b of the Act provided that

[t]hree or more creditors who have provable claims not contingent as to liability ... may file a petition....

Having a provable claim was a *sine qua non* and the claim in order to be provable must "be alive [and] potentially enforceable ...." 1 H. Remington, a Treatise on the Bankruptcy Law of the United States 308–9 (1950). In other words, a provable claim was one "which could be proved in any subsequent bankruptcy proceeding." *In re All Media Properties, Inc.*, 5 B.R. at 135. The requirement of provability generally foreclosed holders of disputed claims from becoming petitioning creditors. *Id.*

The Bankruptcy Code of 1978 substantially relaxed the rigid requirements under the Act. As stated in *In re All Media Properties, Inc.*, the Bankruptcy Code "entitles the holders of disputed claims to initiate involuntary proceedings as long as the claim is not contingent." *Id.* at 135. In addition, the court also noted that

there is no longer any requirement that the claims be provable in order for an involuntary petition to be brought. Only holders of claims that are contingent as to liability are denied the right to be petitioning creditors. It is significant that holders of unmatured, disputed and unliquidated claims are not specifically barred from being petitioning creditors.

*Id.* at 132; *Matter of Covey*, 650 F.2d 877, 881 (7th Cir.1981). This result was achieved by two sections of the Code. First, Section 303(b)(1) gave any holder of a claim that is not contingent as to liability the right to be a petitioning creditor. Second, Section 101(4) defined "claim" as follows:

(4) claim means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured, or unsecured.... (Emphasis added).

Based on Section 303(b)(1) and Section 101(4), cases under the Code have held that holders of disputed claims were allowed to be petitioning creditors. *In re Dill*, 731 F.2d 629 (9th Cir.1984); *In re All Media Properties, Inc.*, 5 B.R. 126 (S.D.Tex.1980); *In re First Energy Leasing Corp.*, 38 B.R. 577 (E.D.N.Y.1984); *In re B.D. Intern Discount Corp.*, 701 F.2d 1071 (2nd Cir.1983); *cert. denied*, —— U.S. ——, 104 S.Ct. 108, 78 L.Ed.2d 110. *Matter of Covey*, 650 F.2d 877 (7th Cir.1981). The case law, nevertheless, provided an exception to this general rule when a debtor could establish that the debt was barred without substantial factual or legal questions.

[I]f the debtor can establish to a certainty that the debt is barred or that the amount is other than alleged without substantial factual or legal questions, then the alleged debt should not be con-

sidered and the holder would not be qualified to be a petitioning creditor in the amount claimed.

*In re All Media Properties, Inc.*, 5 B.R. at 135–36.

Because holders of disputed claims were clearly permitted to be petitioning creditors under the Code, cases generally have not discussed disputed claims within the context of the standing of petitioning creditors. Rather, the bulk of the analysis of disputed claims appear in discussions of the second prong of the test for involuntary bankruptcy which is found in Section 303(h). Under Section 303(h), the Court must determine whether the debtor has generally not been paying its debts as they become due. Several tests have been developed by the courts to determine whether disputed claims should enter into the Section 303(h) calculation.

In the case of *In Matter of Covey*, 650 F.2d 877 (7th Cir.1981), the Seventh Circuit ruled that the Court must examine several factors to determine whether disputed debts should enter into the Section 303(h) calculation. The Court held that disputed debts should be excluded from the Section 303(h) calculation under the following circumstances:

1. The dispute is whether any claim exists, not merely regarding the amount of the claim;

2. The dispute can be examined without substantial litigation of legal or factual questions; and

3. The interest of the debtor in defeating an order of involuntary bankruptcy outweighs creditors' interests in achieving a somewhat more rapid determination of the involuntary.

*Id.* at 883–884.

In contrast to the Seventh Circuit, the Ninth Circuit in the case of *In re Dill*, 731 F.2d 629 (9th Cir.1984), utilized a simple balancing test. The Court stated that

the rule to be applied by the Bankruptcy Court on remand is to balance the interests of the creditor's against those of the Debtor.

*Id.* at 632. *See also In re Central Hobron Associates*, 41 B.R. 444 (D.Haw.1984).

Although the Seventh and Ninth's Circuits' analysis of disputed debts are part of the generally not paying debts test found in Section 303(h), their analysis are, nevertheless, helpful in applying the revisions made by the Bankruptcy Amendments and Federal Judgeship Act of 1984 with respect to disputed claims within the context of the standing of petitioning creditors. The 1984 amendments to the Bankruptcy Code made significant revisions regarding disputed claims. First, the test for the standing of petitioning creditors was revised to provide that holders of claims which are subject to bona fide disputes are barred from being petitioning creditors. Second, debts which are subject to bona fide disputes were excluded from the test provided in Section 303(h) which provides that the court shall order relief if the debtor is generally not paying debts as such debts become due.

■ It is evident that under the 1984 amendments, creditors holding claims which are subject to bona fide disputes cannot be petitioning creditors under the threshold test of Section 303(b)(1). As stated in Colliers, "[t]his does not mean of course that the debtor can assert any defense to a claim and be successful. Presumably, there must be a 'bona fide dispute' which a bankruptcy judge must find either on a motion to dismiss or at trial." 2 Collier's on Bankruptcy ¶ 303.08(b) (1985). Collier's also provides that "[i]f a petitioner's claim is dismissed on this ground, the court may permit additional petitioners to join in the petition in order for there to be qualified petitioning creditors." *Id.*

■ A bona fide dispute is a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side. Having reviewed the prior cases concerning disputed claims, the Court will consider the following factors in determining whether any of the claims in the instant case is subject to a bona fide dispute;

1. The nature of the dispute;

2. The nature and the extent of the evidence and allegations presented in support of the creditor's claim and in support of the debtor's contrary claims.

3. Whether the creditor's claim and the debtor's contrary claims are made in good faith and without fraud or deceit.

4. Whether on balance the interests of the creditor outweighs those of the debtor.

Having determined the guidelines, it is necessary to analyze the status of each petitioning creditor to determine if they are proper petitioning creditors.

### III. *Chicago Credit*

█ The nature of the dispute between Chicago Credit and the Debtor involves a dispute of the entire claim. Chicago Credit claims that at the time of the filing of the involuntary petition, the Debtor was indebted to Chicago Credit in the amount of $10,-000.00. On February 27, 1984, the Debtor had executed a promissory note in favor of Champion in the amount of $10,000.00. Chicago Credit claims that on November 1, 1984, Champion transferred the promissory note to Chicago Credit in partial satisfaction of a debt. Chicago Credit claims that it gave Champion a credit in the amount of $7,500.00 against Champion's debt to Chicago Credit.

The Court notes that Chicago Credit's claim against the Debtor is based on its status as a transferee of a promissory note originally made by the Debtor in favor of Champion. It is noteworthy that Chicago Credit's claim is not the result of any direct transactions between the Debtor and Chicago Credit.

The drafters of the Bankruptcy Code were aware of the possible abuses of transferred claims for the purpose of instituting involuntary petitions. Thus, Rule 1003(c) specifically provides that a transferee of a claim shall annex to the original all documents evidencing the transfer and a signed statement that the claim was not transferred for the purpose of commencing the case and setting forth the consideration and the terms of the transfer. Furthermore, this subdivision retains the explicitness of the former Bankruptcy Rule 104(d) and provides that a transfer of a claim for the purpose of commencing a case under the Code is a ground for disqualification of a party to the transfer as a petitioner. *See* Advisory Committee Note to Bankruptcy Rule 104(d). A claim of a transferee is therefore subject to close scrutiny for potential abuse.

Chicago Credit presented a copy of the promissory note from the Debtor to Champion. However, there is a conspicuous absence of any document evidencing the debt between Champion and Chicago Credit. There is no information in the files with respect to the nature of Champion's debt to Chicago Credit. Likewise, Chicago Credit failed to annex to the petition all documents evidencing the transfer of the promissory note from Champion to Chicago Credit. Chicago Credit has merely presented the Affidavit of Vincent Coniglio, the President of Champion, in which Coniglio states that Champion transferred the promissory note to Chicago Credit and received a credit in the amount of $7,500.00.

The Debtor contends that Chicago Credit's claim is contingent upon the receipt of a stand-by loan commitment from Champion and that this contingency has not been satisfied. The Debtor refers to certain language on the reverse of the promissory note, which provides as follows:

> This note is due and payable upon receipt of an interim loan commitment for Shadow Hawk, and is secured by the stand-by loan commitment from Champion Mortgage, with terms and conditions satisfactory to Johnston Hawks, Limited and Jack J. McGarrity.

The Debtor submitted the Affidavit of McGarrity in which McGarrity claims that the terms and conditions of the stand-by loan commitment were unsatisfactory and that the Debtor, therefore, did not accept the stand-by loan commitment. Moreover, the Debtor claims that no interim lender would accept Champion's commitment as security because Champion did not have

sufficient funds to fund the stand-by loan commitment.

Based on the foregoing, the Court finds that the nature and the extent of the evidence and allegations presented by both the Debtor and Chicago Credit indicate that Chicago Credit's claim is subject to a bona fide dispute. Although the Court questions the good faith of both parties, the Court further finds that, on balance, the Debtor's interests in preventing the involuntary petition outweighs those of Chicago Credit. In particular, the Debtor's interest in preventing the involuntary bankruptcy include the possible damage to its business and to its credit. In contrast, Chicago Credit's interest is that of a transferee of an alleged claim against the Debtor. The Court, moreover, notes that Chicago Credit, as the transferee, has failed to comply with Rule 1003(c) which requires a transferee to annex to the petition all documents evidencing the transfer and has failed to provide the Court with detailed information concerning the transfer and concerning the nature of Champion's debt to Chicago Credit. In addition, the Court is aware that the transfer of the promissory note was made only a few months prior to the filing of the involuntary petition. For the above mentioned reasons, the Court finds that Chicago Credit's claim was subject to a bona fide dispute at the filing of the involuntary petition. As such, Chicago Credit may not be a petitioning creditor.

## IV. *MPI Consultants.*

MPI claims that at the time the involuntary petition was filed, the Debtor was indebted to MPI in an amount of not less than $120,000.00 for its services as an interim loan broker. In contrast, the Debtor claims that MPI is not a creditor because MPI signed a Waiver and Full and Final Release of All Claims ("Waiver"), in which it agreed to release the Debtor from all claims connected with any transaction between MPI and the Debtor. This Waiver, however, was signed 14 days after the involuntary petition was filed against the Debtor.

It is well-established that a "claimant's standing under 11 U.S.C. § 303(b) should not be eliminated merely because an alleged debtor pays its debts to that claimant after an involuntary bankruptcy petition has been filed." *In re Midwest Processing Co.,* 41 B.R. 90, 99 (Bankr. N.D.1984); *In re All Media Properties, Inc.,* 5 B.R. at 144–45. For the purpose of granting or denying relief, the debts must be examined at the time the involuntary petition was filed. *In re Midwest Processing Co.,* 41 B.R. at 98. Thus, the fact that the Debtor obtained a Waiver from MPI after the filing of the involuntary petition does not preclude MPI from being a petitioning creditor. The Court will, therefore, examine MPI's claim *at the time of the filing* of the involuntary petition to determine whether MPI is qualified to be a petitioning creditor.

The nature of the dispute involves the amount, if any, of the claim for payment for services rendered by MPI in connection with the financing of the Shadow Hawk project. When the alleged dispute involves the amount of the claim, the Court is aware that a debtor may easily defeat an involuntary petition by merely challenging the amount of the claim. For this reason, the Court will closely scrutinize a dispute as to the amount of the claim to determine whether such a dispute is bona fide.

In the instant case, there are no documents in the files evidencing an employment agreement between the Debtor and MPI for interim loan broker services. However, MPI refers to letters written by the Debtor, one of which was written on December 20, 1984, less than two months prior to the filing of the involuntary petition, which allegedly acknowledged the claim. In contrast, the Debtor argues that these letters were written under the mistaken belief that it was indebted to MPI. The Debtor states that, after conversations with its legal counsel, it determined that it did not owe the amount claimed by MPI. However, the Debtor fails to adequately explain the reasons for its belief that it does not owe the amount claimed by MPI.

Since the Debtor failed to explain the reasons why it believes that it does not owe the amount claimed by MPI and because it has repeatedly admitted owing $120,000.00 to MPI in several letters, the Court questions the good faith of the Debtor in challenging the claim. Although MPI has failed to present evidence with respect to any employment agreement, the Court finds no reason to question the good faith of MPI. In addition, since the Debtor admitted owing $120,000 to MPI less than two months prior to the filing of the petition, the Court finds that the interests of MPI outweighs those of the Debtor.

In its oral ruling, this Court held that MPI's claim was subject to a bona fide dispute; however, based upon the foregoing, the Court now finds that the claim was not subject to a bona fide dispute at the time of the filing of the involuntary petition. The Court therefore finds that MPI has standing to be a petitioning creditor.

## V. *Champion Mortgage Company.*

Champion claims to be the holder of a claim against the Debtor in the amount of not less than $150,000.00 for bond broker services rendered by Champion to the Debtor.

The Court notes that the nature of the dispute between Champion and the Debtor involves the amount of payment which is owed to Champion. The Debtor claims that the stand-by loan agreement provides that the sole remedy for Champion in the event that the Debtor elects not to accept the stand-by loan commitment is to retain the $30,000.00 deposit. The Debtor claims to have paid the $30,000.00 and has submitted a copy of a check for this amount payable to Champion.

Champion has not submitted any documents evidencing any employment agreement between the Debtor and Champion for bond broker services. However, the Debtor in several letters has admitted to owing $150,000.00 to Champion for bond broker services. For example, on November 8, 1984, McGarrity wrote to First American Title and Insurance Company of Oregon. In this letter, McGarrity stated that he had revised the disbursement list for the closing. Item 13 of this list provides that $150,000.00 is to be paid to Champion Mortgage Company as the Bond Broker. As such, approximately four months prior to the filing of the involuntary petition, there was an admission by the President of the Debtor that the Debtor owed $150,000.00 to Champion for bond broker services.

The Debtor asserts that it consulted with its attorney and that, after being apprised of its rights concluded that it was not indebted to Champion. The Debtor, however, fails to adequately explain the substance of this conversation and the rights of which it was apprised. Based on the foregoing, the nature and the extent of the evidence and allegations presented indicate that the claim is not subject to a bona fide dispute and is not contingent.

On the other hand, the Court questions the good faith of both parties. In addition, the Court finds that on balance, the Champion's interest such as delay of payment of its claim does not necessarily outweigh the Debtor's interest in preventing the involuntary bankruptcy since Champion has received partial payment in the amount of $30,000.00 and because the debt is not one which has been unpaid for several years. Nevertheless, the Court must balance all factors. In particular, the Court notes that approximately four months prior to the filing of the bankruptcy petition, the Debtor acknowledged owing Champion $150,000.00 for bond broker services. Based on the reasons mentioned previously, the Court finds that Champion's claim is not subject to a bona fide dispute. Since the Debtor acknowledged Champion's claim, the Court also finds that Champion's claim is not contingent.

In summary, the Court finds that Champion and MPI may be petitioning creditors. The Court, however, finds that the claim of Chicago Credit is subject to a bona fide dispute. As such, Chicago Credit does not have standing to be a petitioning creditor.

As stated in Colliers, "[i]f a petitioner's claim is dismissed on this ground, the court may permit additional petitioners to join in the petition in order for there to be qualified petitioning creditors." 2 Collier's on Bankruptcy ¶ 303.08(b). *See also Pianta v. H.M. Reich Co.*, 77 F.2d 888 (2nd Cir.1935). The Court will permit additional creditors to join in the petition. However, this Court notes that on March 12, 1985, the Debtor sent to forty creditors a Notice of the Motion to Dismiss, which informed creditors that they may intervene in the involuntary petition. Thus, the creditors have had prior notice of the involuntary petition. For this reason, the Court will limit the period in which additional creditors may join in the petition to two weeks from the date of the Court's oral ruling. If the requisite number of creditors have not joined in the petition, the Court rules that the involuntary petition shall forthwith be dismissed and that the matter of attorney's fees, costs and damages shall be reserved for a subsequent hearing.