**In re UTILIMAX.COM, INC., Debtor.**

**No. 01–14549 SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

July 24, 2001.

**64**

Charles M. McCuen, Philadelphia, PA, for Debtor.

Lisa Salazar, Philadelphia, PA, for PJM Interconnection, L.L.C.

Kevin P. Callahan, Philadelphia, PA, Office of the U.S. Trustee.

#### OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

The matter now before the Court involves an involuntary Chapter 7 Bankruptcy case commenced under 11 U.S.C. § 303. The Debtor is Utilimax.Com, Inc., a Delaware Corporation. Utilimax has suspended its normal business operations, however prior to the cessation of operations the Company was a licensed third party supplier of electricity to commercial and industrial customers in the deregulated states of Pennsylvania, New Jersey and Ohio. In furtherance of its business, Utilimax was one of approximately 180 members in an organization known as PJM Interconnection L.L.C. ("PJM"). PJM is a limited liability company governed by a Board of Managers on a profit neutral basis. PJM is responsible for the operation and control of the bulk electric power system throughout major portions of five middle Atlantic states and the District of Columbia. Broadly speaking, PJM acts as a conduit for its consortium of members. Thus, Utilimax, as an electric generation supplier, purchased network transmission service from PJM to provide retail service to its own customers. The members of PJM are all party signatories to a lengthy document entitled "Amended and Restated Operating Agreement of PJM Interconnection L.L.C." (Exhibit "P–8"), which describes how the consortium is to operate and details the rights and responsibilities of its members. Allegations of default by

Utilimax with respect to payment obligations under the aforesaid Operating Agreement form the undergirding of the instant dispute.

On March 28, 2001, PJM filed the subject involuntary petition against Utilimax, claiming an unpaid obligation for goods sold and delivered in the amount of $1,742,000. PJM was the sole petitioning creditor and asserted in the petition that the Debtor was generally not paying its debts as they became due, and that it, PJM, was eligible to file the petition under 11 U.S.C. § 303(b). On April 2, 2001 PJM followed up the involuntary petition with an emergency motion under 11 U.S.C. § 303(g) for the appointment of an interim Trustee under 11 U.S.C. § 701. In this Motion, PJM stressed uncertainty as to the Debtor's continuation in business and its belief that a primary investor in the Debtor had recently taken steps to obtain all of its assets, inventory, and receivables. An expedited hearing on the emergency Motion was scheduled for April 9, 2001.

On April 6, 2001, Utilimax filed a written response to the emergency Motion. In its response Utilimax raised two separate and discrete issues. First, the Debtor maintained that the claim asserted by PJM was subject to a bonafide dispute. Specifically, Utilimax contended that the bills which it had received from PJM were inaccurate and did not reflect actual services received. In this respect, too, Utilimax contended that PJM itself had acknowledged that its procedures and conduct had resulted in a variety of failings, including market volume distortions, which produced artificial and misleading price signals, which in turn led to market manipulation by various energy providers. Utilimax maintained that it was market manipulation that caused its primary investor, an individual named Ira

M. Luppert, to declare Utilimax in default of a certain loan transaction and seek to take possession of the Company's assets. Utilimax denied that any irregularities attended that particular event, and added that it expected to bring anti-trust charges against PJM and those other parties responsible for the market manipulation which it says occurred.

The foregoing aside, Utilimax also asserted that it had more than 12 creditors and had so advised PJM both verbally and in writing. Thus, it argued, the Trustee Motion was fatally flawed because the underlying involuntary motion by PJM was deficient for want of the requisite three creditors under 11 U.S.C. § 303(b)(1). Indeed, Utilimax asserts that the instant proceeding is entirely the product of bad faith on the part of PJM.

Following colloquy with counsel at the hearing on April 9, 2001, a consent Order was entered pursuant to the terms of which a trustee would not be appointed, however the Debtor would agree 1) to limit its future expenditures to the few operating expenses needed to pursue collection of its outstanding accounts receivable, and 2) to make no transfer of assets outside the ordinary course of its reduced operations without further Order of Court.

On April 23, 2001, Utilimax filed an Answer to the Involuntary Petition, once again raising the issue of three versus one petitioning creditor and also denying that it was not generally paying its debts as they came due. Appended to the Answer as Exhibit "A" was a schedule listing the names and addresses of 19 alleged creditors of Utilimax.[1] Utilimax requested that the Involuntary Petition be dismissed and that it be awarded its attorneys fees and expenses, as well as punitive damages.

1. This schedule was amended by Praecipe on May 11, 2001 to include the amount owed to each creditor and a description of the basis of each creditor's claim.

In a Pre–Trial Order dated May 3, 2001, the Court set the matter for trial on June 13, 2001. This hearing was subsequently continued by agreement until June 21, 2001, but was then rescheduled by the Court to June 20, 2001. On May 15, 2001, the parties submitted a discovery report pursuant to F.R.C.P. 26(f). In it they detailed their agreement as to the exchange of pre-trial discovery information. Despite this, on May 29, 2001 PJM filed a Motion for a Protective Order contending that it was in receipt of "massive, burdensome, and wholly irrelevant" discovery from Utilimax all of which related to the allegations of market manipulation which Utilimax had interposed as the basis of its "bonafide dispute" defense. PJM argued that the bonafide dispute defense was without merit 1) because certain portions of the obligations of Utilimax were not disputed; 2) because Utilimax, to the extent it disputed any portion of the outstanding bill, had failed to avail itself of applicable remedies set forth in the operating agreement, and 3) because, as a matter of law, an alleged anti-trust claim could not serve as the basis for a bonafide dispute defense in the context of a disputed involuntary bankruptcy case.

On June 4, 2001, Utilimax filed a written response to the PJM Motion for a Protective Order. In it Utilimax contradicted PJM's assertion that the entirety of PJM's outstanding bill was not, in fact, in dispute, and observed that PJM itself had failed to resort to the dispute resolution mechanism set forth in the operating agreement prior to commencing the involuntary case. Most significantly, however, Utilimax took strong issue with PJM's contention that its claims relative to market manipulation, as such might later take the form of charges of anti-trust violations, could not underpin a bonafide dispute defense. Each side cited to what it believed to be relevant authorities on that important issue, with Util-imax noting the general discussion of the objective standard test applicable to the bonafide dispute defense to be found in *B.D.W. Associates, Inc. v. Busy Beaver Building Centers, Inc.* 865 F.2d 65 (3d Cir.1989), as follows:

The test to be applied in determining the existence *vel non* of a bona fide legal dispute in this context has been described in various ways. For example, in *In re Johnston Hawks, Ltd.,* 49 B.R. 823 (Bankr.Hawaii 1985), a bona fide dispute was defined as "a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side". *Id.* at 830. In *In re Stroop,* 51 B.R. 210 (D.Colo.1985), the test was equated with the standards for granting summary judgment. A more complete formulation was expressed in *In re Lough,* 57 B.R. 993 (Bankr.E.D.Mich. 1986), [* *4] *viz:* "If there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed." *Id.* at 997. The Seventh Circuit Court of Appeals has adopted that definition with a gloss, see *In re Busick,* 831 F.2d 745 (7th Cir.1987) ("substantial" factual and legal questions [*67] raised by debtor preclude finding of involuntary bankruptcy), which the parties agree is acceptable, and we adopt it here.

A hearing on the PJM Motion for a Protective Order was scheduled for June 6, 2001. At that hearing the Court shared with the parties its sense that the bonafide dispute defense, and the question of the viability of anti-trust allegations as the basis therefore, was a complex question in general and likely to be particularly so in

this setting. The Court had not resolved the question at that juncture, and noted that the question of the eligibility of PJM to act as a sole petitioning creditor had been joined in the Debtor's answer, as had the question of whether the Debtor was generally paying its debts as they became due. Both of these issues, although most clearly the former, appeared to the Court to present threshold questions the prompt disposition of which might be the most efficient and expeditious way in which to resolve the contest over the legitimacy of the involuntary petition. That said, the Court indicated that it would bifurcate the proceeding, with the trial on June 20, 2001 to go forward on the issues of the number of creditors versus petitioners, and whether the Debtor was generally paying its debts as they came due, and with the Court holding under advisement the question of the bonafide dispute defense pending a later decision on that issue as might be necessary.

In the aftermath of the June 6, 2001 hearing, counsel for the parties evidently had conversations the thrust of which was that additional creditors might possibly be joining PJM as petitioners in the case under 11 U.S.C. § 303(c), which fact might of course obviate the dispute over the commencement of the case by PJM alone. On June 15, 2001 counsel for PJM wrote to counsel for Utilimax and identified the potential joiners as the Boeing Company—Philadelphia, Carpenter Technology Corporation and Lehigh Portland Cement Company. (Exhibit "D-1") Notwithstanding the foregoing, on June 18, 2001, the Court held a conference call with counsel for the parties during a discovery deposition and was advised by them at that time that, although there was the continuing possibility that additional creditors might be joining PJM as petitioners in the involuntary filing, their identity had changed. Specifically, Utilimax stated its belief that the potential joiners would now turn out to be none other than fellow members of PJM. Utilimax expressed doubt that such companies could qualify as the holders of claims against the Debtor. On the morning of the hearing, four purported "joiners" were in fact filed, as follows:

| Name and address of Joining Creditor | Nature of Claim | Amount of Claim |
| --- | --- | --- |
| Baltimore Gas & Electric Company<br>39 W. Lexington Street<br>Baltimore, MD 21201 | Services sold and delivered<br>Amounts due under contract | $161,767.22 |
| Delmarva Power & Light Co.<br>P.O. Box 231, Wilmington DE 19899 | Services sold and delivered<br>Amounts due under contract | 107,230.64 |
| Atlantic City Electric Company<br>P.O. Box 231, Wilmington DE 19899 | Services sold and delivered<br>Amounts due under contract | 63,814.59 |
| Potomac Electric Company<br>1900 Pennsylvania Ave<br>Washington DC 20068-0001 | Services sold and delivered<br>Amounts due under contract | 159,759.21 |

(Collectively Exhibit "P-1")

The above entities, as predicted, are members of PJM and parties to the group operating agreement. Utilimax argues that these Joinders are both substantively and procedurally defective and asks that they be disregarded. PJM opposes both assertions and asks that the Joinders be accepted. Having considered this pivotal and threshold issue, the Court finds the

joinder of the above entities to be invalid. Having so concluded, the Court finds further, there being no dispute that Utilimax has in excess of 12 creditors, that the commencement of this case by PJM alone contravenes 11 U.S.C. § 303(b). The involuntary petition, accordingly, must be dismissed.

■ The rules which govern the joinder of additional petitioning creditors in the context of an involuntary bankruptcy case are fairly liberal, with joinder being permitted under 11 U.S.C. § 303(c) anytime during the gap period between the date of the filing of the petition and the date the case is dismissed or an Order for Relief is entered. F.R.B.P. 1003(d). Creditors eligible to join are those that were not petitioning creditors under § 303(b) and who hold unsecured claims that are not contingent. Bankruptcy Rule 1003(b) is intended to complement Code § 303(c) by providing that a joining creditor will have a reasonable opportunity to join before the Court holds a hearing on the original petition. Code § 303(c) can be utilized where there are an insufficient number of petitioning creditors although the dollar requirement of § 303(b) has been satisfied, and there is nothing inherently wrong with petitioning creditors soliciting other petitioning creditors to join with them. The three creditor requirement in § 303(b)(1), nevertheless, is not a mere formality and efforts to comply with it must be scrutinized carefully. *See generally* 2 COLLIER ON BANKRUPTCY ¶ 303.09[1] (Matthew Bender 15th Ed. Revised 2000).

■ As a threshold matter, a would-be joining creditor must possess a claim against the Debtor. A claim is defined in the Bankruptcy Code as a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. 11 U.S.C. § 101(5)(A). The present joinders fail on this most fundamental of bases. In this instance, the alleged claims of the would be petitioning creditors are all derivative of PJM's claim. The controller of PJM, Suzanne Daugherty testified to this on June 20, 2001 and explained the circumstances which prompted the joinders. Specifically, she made reference to ¶ 15.2 of the PJM operating agreement which provides as follows:

### 15.2 Enforcement of Obligations.

If the Office of the Interconnection sends a notice to the PJM Board that a Member has failed to perform an obligation under this Agreement, the PJM Board shall initiate such action against such Member to enforce such obligation as the PJM Board shall deem appropriate. Subject to the procedures specified in Section 15.1, a Member's failure to perform such obligation shall be deemed to be a default under this Agreement. In order to remedy a default, but without limiting any rights the LLC may have against the defaulting Member, the PJM Board may assess against, and collect from, the Members not in default, in proportion to their Weighted Interest, an amount equal to the amount that the defaulting Member has failed to pay to the Office of the Interconnection, along with appropriate interest, but such assessment shall in no way relieve the defaulting Member of its obligations, and shall confer upon the Members Committee the right to recover the assessed amounts from the defaulting Member. In addition to any amounts in default, the defaulting Member shall be liable to the LLC for reasonable costs incurred in enforcing the defaulting Member's obligation.

Pursuant to the above passage, Daugherty testified that the amount claimed by

PJM to be due from Utilimax was reassessed to all of the other consortium members in accordance with the formula set forth in Section 1.49 of the Operating Agreement. The "claims" asserted by the joining petitioners in their filings here represent the particular sums assessed to and paid by them. PJM argues that the payments by the adjoining parties give rise to a claim on their part against Utilimax. While there is some superficial appeal to PJM's point, it does not withstand scrutiny.

Contrary to the assertions in the filed Joinders the individual joining petitioners did not sell or deliver services to Utilimax, PJM did that. Nor is there any contract between Utilimax and the joining creditors which creates a direct right of action between them *inter se.* Section 15.2 of the Operating Agreement does not invest a member company which pays the reassessed bill of a member in default with direct recourse against such company. On the contrary, Section 15.2 of the Operating Agreement confers the right to recover the assessed amount from the defaulting member on the "Members Committee." The Members Committee is a committee comprised of representatives of all of the member companies and operates as a *collectivity* in accordance with provisions found at Section 8 of the Operating Agreement. Nothing in Section 15.2, or in the entirety of Section 8 of the Operating Agreement purports to create an independent right to payment on the part of one member against another. Moreover, nothing in the Operating Agreement would dictate that if the Members Committee did recover a defaulting member's obligation it would necessarily be obliged to distribute those monies to the consortium members, as opposed to using them for other purposes. PJM argues that Section 15.2 should be interpreted so as to imply such things, but the Court declines to do so, given that the

express language of Section 15.2 is clear and unambiguous.

The Court also discounts Daughtery's testimony (N.T. 42, 43) that at a Members Committee meeting whereat the Utilimax situation was discussed, of which meeting there are no minutes or other written memorialization, certain representatives were apparently heard to encourage the committee's pursuit of the Utilimax delinquency, subject to a "stipulation" that in endorsing that course of action they were not waiving the right to pursue collection independently. If the right existed in the first place there should be no need to stipulate to its survival. Indeed, this argument serves to underscore the point in question. Such remarks, to the extent they were made at all, are errant. Section 15.2 of the Operating Agreement, once again, confers the right to pursue collection on the Members Committee alone. To the extent PJM maintains that the conversations in question were intended to create, or had the effect of creating rights which did not previously exist under the operating agreement, the Court disagrees. The Court further rejects any notion that the alleged discussions in some way amounted to a *de facto* amendment to Section 15.2 of the operating agreement. The means by which the Members Committee can act and the method by which any provision of the Operating Agreement can be amended are each set forth in detail in Section 8 and Section 18.4 of the Agreement, respectively. Evidence of compliance with the terms of these sections is not present in this record.

In some respects, this case is analogous to those cases wherein courts have confronted the question of whether an obligation held jointly by one or more creditors should be considered the claim of each for purposes of establishing eligibility to commence an involuntary bankruptcy case.

Case law on that generally fact intensive question is divided. *Compare In re Gilbert*, 115 B.R. 458 (Bankr.S.D.NY.1990) (bank acquiring three separate claims against debtor held to be holder of a single obligation), with *In re Richard A. Turner Company, Inc.*, 209 B.R. 177 (Bankr. D.Mass.1997) (collective bargaining agreement which created three separate funds gave each fund an independent claim even where three debts were reduced to a single judgment). The joint obligation line of cases is distinguishable, however, because, as a threshold matter the creditors in questions in joint obligation cases possess an indisputable right to payment from the Debtor. That essential predicate is lacking here. Hence the petition will be dismissed.

■ The belated Joinders appear to the Court really to just be a contrivance on the part of PJM intended to salvage its position herein. Other than their association as members of PJM there is no contractual relationship between Utilimax and the other petitioning creditors, and no demands, verbal or written, have ever been made upon Utilimax by the joining creditors with respect to their alleged "claims." Daugherty solicited the joinders by telephone, presumably after the creditors originally expected to join PJM did not do so. No representatives of any joining creditor attended the hearings in this matter. They were instead represented by counsel for PJM, who also prepared and filed the written joinders on their behalf. While the Petition fails for the reasons already discussed, these latter circumstances, of course, can have a bearing on the debtor's claim under 11 U.S.C. § 303(i) for fees, costs and damages.

The Court has considered the question of bad faith but is unpersuaded that it exists here. The Court will award fees and costs in this instance, but will deny the debtor's request for punitive damages, On this point, it seems clear that a misguided conclusion was reached by PJM that its best strategy lay in pursuing an involuntary bankruptcy. At the hearing, counsel for PJM stressed that the decision stemmed from the assumed availability of a prompt forum to address the alleged dissipation of assets issue. In colloquy the Court noted that a speedy and effective remedy would have been equally available on that issue in state court, so the filing here remains somewhat puzzling. Nevertheless, despite having some lingering skepticism, the Court is unconvinced that a showing of bad faith is made out on this record. Accordingly, the Court will, as noted, deny the Debtor's request for damages, but it will schedule a follow-up hearing to liquidate the award to be made to the Debtor for attorney fees and costs. In closing, the Court adds 1) that in view of the decision reached herein the Court need not and therefore does not reach the question of whether the Debtor is or is not generally paying its debts as they come due; and 2) that the terms of the Court's Order of April 12, 2001 shall be vacated.

An appropriate Order follows.

### ORDER

AND Now, upon consideration of the Involuntary Petition filed in the above matter, the Answer in opposition thereto, and after hearing thereon, it is hereby:

ORDERED, that the Involuntary Petition be and hereby is Dismissed; and it is further:

ORDERED, that the Debtor shall be awarded judgment under 11 U.S.C. § 303(i) against Petitioning creditor PJM for the reasonable attorneys fees and costs incurred by it in connection with this matter. A hearing to liquidate said award shall be held September 26, 2001, 10:00 a.m., United States Bankruptcy Court, 900

Market Street, 2nd Floor, Courtroom No. 4, Philadelphia, Pennsylvania, 19107. Within fifteen (15) days of the date of this Order, the Debtor shall provide an itemization of the amount it will request pursuant to this Order with appropriate supporting documentation. If the parties are in agreement as to a figure the hearing may be cancelled by notifying Chambers. If there are specific objection by PJM to the amount requested, the same should be reduced to writing and served upon the Court and the Debtor no later than seven (7) days prior to the scheduled hearing, and it is further:

Ordered, that the Court's Order of April 12, 2001 in this matter shall be and hereby is Vacated.